[Civ. No. 1003.   Fifth Dist.   Feb. 11, 1969.]

JANET ROSE SWITZER et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA et al., Defendants and Respondents.

Boccardo, Blum, Lull, Niland, Teerlink & Bell, Edward J. Niland and Stanley A. Ibler, Jr., for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and Robert L. Bergman, Deputy Attorney General, for Defendants and Respondents.

CONLEY, P. J.—This appeal is prosecuted by the widow and five children of Richard Fleming Switzer who was killed when the truck he was driving plunged off highway U. S. 40 Alternate, into the Feather River Canyon between Quincy and Oroville. The jury brought in a judgment for all of the defendants who were then left in the case, and appellants having been denied a new trial by the superior court, appeal to this court, claiming only that the trial judge erroneously refused a proposed instruction of the appellants.

In the vicinity of the site where the truck dropped to its destruction, the road runs generally east and west; it is a two-lane highway, approximately 22 feet wide; at the place where the accident occurred the road curves to the right (north) as one is proceeding from Quincy to Oroville, and has commenced a downgrade. There is a ditch and then a rising embankment on the north side of the road. To the south there is a very slight shoulder and then a drop down into the Feather River.

A very severe snow storm had occurred on the summit that day, and the road was variously described by witnesses as "wet," "slippery," and "icy." At approximately 1 p.m. a car driven by a Dolly Rathburn, proceeding west from Quincy, rounded this particular curve, spun out of control, and skidded into the ditch on the north side of the road. Approximately 10 minutes later the automobile driven by Delilah Vig also skidded into the ditch to the east of the Rathburn vehicle. A few moments later a third vehicle, operated by Robert E. Wood, slid into the ditch behind the Vig vehicle. The three cars were then entirely clear of all traffic. At approximately 2 p.m. Officer Phillip Prince of the California Highway Patrol arrived on the scene in the course of a routine patrol. He summoned a tow truck from Quincy, which arrived at about 2:45 p.m.

The tow truck operator removed the Wood vehicle from the ditch first and then prepared to work with the Rathburn vehicle. At that time by virtue of the obstruction caused by the tow truck, there were cars stopped in the westbound lane, and in the eastbound lane Officer Prince had halted the traffic. The tow truck was blocking the westbound lane, and a portion of the eastbound lane. Officer Prince was standing in the westbound lane near the center line in the vicinity of the tow truck. Several people were also standing in the roadway near the tow truck in the eastbound lane.

At this point the decedent arrived on the scene, traveling west from Quincy, driving a 10-wheel Kenworth truck with a 3,000-gallon water tank on it. His speed was estimated by various witnesses to be from 25 to 40 miles per hour. The truck rounded the curve and came upon the scene, but at no time did it reduce its speed. Officer Prince, on seeing the truck, waved his arms, first signaling the truck to stop and then motioning it to come on through because the road was clear; the truck could get right on through. But the truck then swerved into the other lane, narrowly missing the last car in line, passed between the highway patrol vehicle and the tow truck, and drove over the bank without changing its speed or direction. There was testimony that the decedent made no attempt to apply his brakes. As the tank truck passed him, Officer Prince saw the driver sitting upright in the cab, looking straight ahead with his eyes as wide as saucers.

There is conflicting testimony as to whether or not there was sufficient room for the tank truck to come around the tow truck and get safely back into his lane. Officer Prince and

several other witnesses thought that there was ample room for the tanker to go through. Several other witnesses did not believe that the truck could have gotten by all other cars successfully.

After the truck went over the side, Officer Prince immediately got his first aid kit and went down over the bank. The decedent was pinned beneath the cab of the truck, which rolled over before it came to rest. The driver, Richard Switzer, was dead; he apparently died during the crash.

There was sharply conflicting testimony as to the safety measures taken by the highway patrolman, Officer Prince, and the tow truck operator at the scene prior to this fatal accident. Dolly Rathburn testified that before the arrival of the tow truck Officer Prince put out flares intermittently. She testified that the tow truck operator did not place smudge pots east or west of the scene, nor did he put out any sign to the east. However, she did see operating on the highway patrol vehicle both the flashing amber light and the red spotlight.

Thomas Pittman, who was driving immediately behind decedent's truck, testified that he did not see any "wreck ahead" signs, or smudge pots in the highway as he came into the turn, nor did he see any flares on the road. He testified that he did not see flashing lights on the tow truck, although he was looking at the tow truck and thinks that he would have seen such lights had they been on. His testimony was corroborated by that of his wife, Guyla Pittman.

. Albert Christenson had been proceeding in an easterly direction, and he was forced to stop at the scene because there were three cars halted ahead of him in his lane of travel. Prior to the time when he stopped his vehicle, he did not see wreck signs, smudge pots or flares in the road, nor did his passenger, Roy Harrison. However, he did see one flare east of the scene of the accident. He testified that he did not see any flashing lights on the tow truck.

On the other hand, there is strong testimony to the effect that all usual or required safety precautions were taken. Officer Prince testified that upon arriving at the scene of the accident he parked his patrol car in a turn-out area parallel with the highway, activated the flashing amber warning light in the rear window of the patrol car, and turned on and pointed the steady red spotlight back across the bend in the canyon so that westbound traffic could see it. He then put out flares both east and west of the scene by crisscrossing three or

four 15-minute flares in such fashion that each would light the next flare for a period of about 45 minutes. He rechecked and replaced these flares several times prior to the accident. He testified that each time he replaced the flares he found the previous ones still burning.

Leon Wilkins, the tow truck operator, testified that when he arrived at the scene, he turned on his blinking red lights, and at the same time put out his ''wreck ahead'' sign east of the scene. He then went west of the accident to a point where he turned around, and at this point placed another sign. He testified that he also put out a smudge pot in front of each sign. When he subsequently left the accident scene, he picked up the signals and smudge pots and found that both smudge pots were still burning.

A witness, Emerson Bargar, testified that the flashing red lights on the tow truck were burning, and the amber and red lights on the highway patrol car were on. He also testified that he saw warning signs and smudge pots both west and east of the accident scene. Claude Doyle testified that the flashing lights on the tow truck were burning, and the warning lights on the patrol car were on. He saw a ''wreck'' sign and a flare west of the accident scene and a similar sign and smudge pot east of the accident scene. Robert Wood saw the warning lights on the patrol car burning as well as the red flashing light on the tow truck. Jeanneal Griswold testified that she saw a flashing red light a quarter of a mile before reaching the accident scene but did not remember seeing flares or wreck signs.

The record shows that the deecdent, with his two adult partners, had gone to the mountains to drive two gigantic tank trucks owned by them down to the warmer flat lands of California and that the three, including most importantly from the standpoint of this case, the decedent Switzer, were not in the best condition by any means to drive a motor vehicle along the roads of the state; they had gone without sleep for many hours and had been drinking considerable amounts of alcoholic liquor prior to the accident. The decedent and Nicholas Pokovich left Watsonville at 1 p.m. or a little later on November 12, 1960, with the purpose of traveling to Susanville in order to bring down the trucks before bad weather set in. They stopped in Santa Clara to pick up the third owner, Nelson Wilhelm, and next stopped in Vallejo where they each had a beer. They, later, halted at Verdi where each of them may have had another beer. They drove on into

Reno, arriving sometime after midnight. They had dinner at Harold's Club, with perhaps an alcoholic beverage at dinner. After dinner the three men gambled for awhile and, subsequently, took a catnap in the pick-up truck, the three of them sitting upright in the cab; but they did not get much rest.

They left Reno at around 3 or 4 a.m. and arrived in Susanville about 6 a.m., November 13, 1960. They went to the apartment of Nell Blosser, Wilhelm's "girl friend." Thereafter, the three men went down town and there purchased a bottle of brandy and some beer. They went to the Pioneer Club and had coffee, or maybe something harder than coffee, the witness being unable to remember. They then went back to the apartment and had one or more cups of coffee with "shots" of brandy in them, called "coffee royals." Thereafter, Pokovich took a short nap and, although he is not sure, he thinks Switzer lay down for a short time also. Whether Switzer got any sleep, he did not know. Around 9 a.m. they left the apartment accompanied by Nell Blosser and started for Janesville to pick up the trucks. On the way they stopped at a bar named "The Gables." Everyone in the party had a beer. They told the owner that they had not been to bed all night.

The party then left "The Gables," whereupon they went directly to a ranch near Janesville where the two trucks were parked. They proceeded with the trucks to Hallelujah Junction; it was there suggested to Switzer that Wilhelm drive one of the big trucks down the canyon because Wilhelm was more familiar with the trucks. Switzer refused. Thereafter, Pokovich proceeded on to Quincy with one truck, Wilhelm remaining in Hallelujah Junction with Nell Blosser. Thereafter, the decedent Switzer left with the other truck for Quincy.

Defendant Leon Wilkins saw Switzer in Quincy. After having missed the turn to Oroville, Switzer pulled over close to Wilkins, almost running into him, and Wilkins asked him, "What the devil is wrong; can't you see?" Switzer asked Wilkins for directions as to how to get to Oroville. At that time Wilkins thought Switzer looked tired and sleepy and noted that his eyes were red; he appeared to have been drinking. Switzer told Wilkins that his brakes were not too good.

Jeanneal Griswold was riding in the rear seat of a black Volvo coming from Lake Almanor. She first saw the tank truck near at hand 5 miles before reaching the accident scene; it drifted over the center line as they were trying to pass it; this made the driver of the Volvo angry, and he gave a long blast on his horn and swore at the tank truck driver. The

Volvo in which she was riding came to a stop at the scene of the accident. About 5 to 10 minutes later, while looking out the rear window, she saw the truck coming; it was running very fast in view of the situation. As the tank truck got closer, she observed the driver with his head bowed down. As he got closer, his head raised up suddenly and his face looked shocked. Then, he turned sharply when about 20 feet from their car and went over the side.

Plaintiffs brought suit for wrongful death, naming as defendants Officer Prince, the State of California, the drivers of the three cars in the ditch, the tow truck operator Leon Wilkins, and Quincy Motor Sales, Inc., Wilkins' employer and owner of the tow truck. Prior to or during trial, summary judgment was granted or causes of action were dismissed as to all defendants except the State of California, Leon Wilkins, the tow truck operator, and his employer, Quincy Motor Sales. On August 9, 1966, after 11 days of trial, the jury returned a verdict against the appellants and in favor of all remaining defendants. Plaintiffs now bring this appeal.

Only one alleged error is complained of, namely the failure of the trial court to give instruction No. 45 proposed by the plaintiffs; originally this instruction was not included in the transcript on appeal but by stipulation between the parties it at last became a part of the record. The instruction in question is in the following words and figures:

"The liability of the State of California is based on either of the two following theories of legal liability:

"(1) Negligence as defined in my instructions.

"(2) A dangerous condition of public property as hereinafter defined to you.

"In determining the liability of the State of California regarding the dangerous condition of public property, if any, you should consider the following applicable Government Code Sections:

"Government Code Section 830 (a), (b) and (c).

"Government Code Sections 830.4, 830.8 and 835."

The sections of the Government Code referred to in the proposed instruction were in fact given as part of the charge:

"The liability of the State of California is predicated on Government Code Section 835 which provides as follows:

" 'Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proxi-

mately caused by the dangerous conditon, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.'

''In considering this section of the Government Code, you are instructed to also consider the following Government Code sections: '830. As used in this chapter: (a) ''Dangerous condition'' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used. (b) ''Protect against'' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition. (c) ''Property of a public entity'' and ''Public property'' means real or personal property owned or controlled by the public entity, but do not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity.'

'' '830.4. A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code.'

'' '830.8. Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by a person exercising due care.' ''

Certainly there can be no complaint that the substance of the proposed and refused instruction No. 45 was not given.

Instruction No. 45 as proposed by plaintiffs is not in proper form in that it purports to state what the liability of the State of California is based on rather than stating the plaintiffs' theory of liability. Inasmuch as the State of California consistently urged that it had no liability, the form of the proposed instruction was grossly improper and it was correctly refused. But overlooking for the moment the improper form and keeping in mind that a major part of the substance was completely complied with through the actual giving of instructions incorporating sections 835 and 830 of the Government Code, we find that the remaining part of the instruction is ''negligence as defined in my instructions.'' It should not be forgotten that negligence in its general sense was the subject of instructions applicable particularly to the tow truck driver and his employer. To instruct the jury that the state would be responsible for negligence ''as defined in my instructions'' does not raise the specific point that is sought to be injected into the case on appeal. The brief on appeal ''smells of the lamp''; we believe that it is quite clear that it is an afterthought written into the case long after the jury had refused to grant any judgment to the plaintiffs. Appellants now seek to hold the State of California on the theory that the officer was guilty of negligence in his attempt to right the improper and dangerous condition caused by the three cars incapacitated on, or near the roadway. It seems apparent to us that the argument now sought to be made a part of the appeal is a false quantity in that the legal situation which the appellants seek to invoke is a complex one and dependent upon whether or not the state is responsible for alleged negligence on the part of Officer Prince; the phrase used in the proposed instruction ''negligence as defined in my instructions'' does not begin to advise the jury as to what it must look for in the evidence and impliedly find in order to hold the state for negligence of the highway patrol officer under the plaintiffs' theory.

The appellants would have us indulge in a long and involved discussion and suggested conclusion with respect to negligence of an employee of the state, which would be dictum and not binding on anybody in the future. We refuse to be thus drawn into a sterile controversy.

In a civil case such as this each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court owes no duty to instruct on its own motion. In 1

Stanbury, California Trial and Appellate Practice, section 616, page 671, it is said: "The court has no duty in a civil case to instruct a jury without a request from one of the parties, and one who has made no request cannot complain of the failure to instruct. 'A party may not complain of a trial court's failure to instruct upon a subject upon which no proper instruction was requested. . . . There is no duty, in civil cases, for a trial court to give on its own motion instructions on issues not covered by proffered instructions.' "

In 2 Witkin, California Procedure (1954) Trial, section 52, page 1780, it is said: "In order to complain of failure to instruct on a particular issue the aggrieved party must request the *specific proper instruction*. . . . Similarly, if the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction* in order to have the error reviewed."

See also *Phillips* v. *Noble*, 50 Cal.2d 163, 166 [323 P.2d 385]; *Barrera* v. *De La Torre*, 48 Cal.2d 166, 172 [308 P.2d 724]; *Ornales* v. *Wigger*, 35 Cal.2d 474, 478-479 [218 P.2d 531]; *Lahti* v. *McMenamin*, 204 Cal. 415, 421 [268 P. 644]; *Wirthman* v. *Isenstein*, 182 Cal. 108, 110 [187 P. 12]; *Townsend* v. *Butterfield*, 168 Cal. 564, 569 [143 P. 760]; *O'Connor* v. *United Railroads*, 168 Cal. 43, 52 [141 P. 809]; *Gould* v. *Samuels*, 132 Cal.App.2d 459, 469-470 [282 P.2d 566]; *Mula* v. *Meyer*, 132 Cal.App.2d 279, 286 [282 P.2d 107]; *Kuehn* v. *Lowthian*, 124 Cal.App.2d 867, 873 [269 P.2d 666]; *Sherrillo* v. *Stone & Webster Engineering Corp.*, 110 Cal.App.2d 785, 789-790 [244 P.2d 70]; *James* v. *Myers*, 68 Cal.App.2d 23, 29-30 [156 P.2d 69]; *Peckham* v. *Warner Bros. Pictures, Inc.*, 42 Cal.App.2d 187, 189 [108 P.2d 699]; *Scott* v. *Flanagan*, 14 Cal.App.2d 105, 112 [57 P.2d 1382]; *Crooks* v. *White*, 107 Cal.App. 304, 311 [290 P. 497]; *Johnson* v. *Pearson*, 100 Cal. App. 503, 507 [280 P. 394]; *Sherman* v. *Kirkpatrick*, 83 Cal. App. 307, 312 [256 P. 570]; *Carbaugh* v. *White Bus Line*, 51 Cal.App. 1, 5 [195 P. 1066]; *Potter* v. *Back Country Transp. Co.*, 33 Cal.App. 24, 26 [164 P. 342]; Witkin, California Procedure (1954) 1967 Supplement, Trial, sections 52, 53, pages 691, 692.

■ The trial judge did not owe a duty to prepare the complicated instruction which the appellants now apparently have in mind relative to possible negligence of the State of California by reason of the action or inaction of Officer Prince of the Highway Patrol. For us now to delve into a theoretical situation which was not presented by a properly worded

instruction would be to discuss without sufficient reason principles of the law which if reduced to a holding would not be a dependable guide to future action by the state or the members of the Highway Patrol.

As previously pointed out, it is our conclusion that it was not error for the trial court to refuse plaintiffs' instruction No. 45, but if we should assume for the sake of argument that such an instruction should have been given, it has not been shown by appellants that any prejudice resulted from such refusal. Article VI, section 13 of the California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The jury returned a verdict in favor of all remaining defendants; that is to say, the tow truck driver, his employer and the State of California. The jury was instructed that it was the statutory duty of the tow truck driver to place warning signs upon the truck and the highway, and the jury was instructed that if there was a failure to do so on the part of the driver of the tow truck a presumption would arise that the violator was negligent. In returning the verdict, therefore, the jury must have believed either that the tow truck driver, Wilkins, did comply with all of the requirements set forth in the Vehicle Code, or that if there was a failure to do so this negligence did not contribute to cause the accident, or that in any event the decedent was guilty of contributory negligence as pleaded by the defendants. The evidence was uncontradicted that decedent had been awake and active for more than 24 hours, that he had been drinking, and that when seen in Quincy a short time before the accident he looked tired, sleepy, red-eyed and affected by alcohol. It also should not be forgotten that there was testimony that as Mr. Switzer approached the scene of the accident his head was bowed down on his chest and that he swerved just before he reached the last car in line; the jury had ample evidence to justify a viewpoint that the decedent's own negligence was the cause of his death.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.