[Civ. No. 44719. Second Dist., Div. Three. Mar. 26, 1976.]

MARVIN FISH et al., Plaintiffs and Appellants, v.
LOS ANGELES DODGERS BASEBALL CLUB et al.,
Defendants and Respondents.

622

**COUNSEL**

Weissburg & Aronson, Stanley K. Jacobs and Lyle R. Mink for Plaintiffs and Appellants.

George McDonald, Robert M. Granieri, Home & Clifford, Richard R. Clifford, Ellis J. Horvitz and Irving H. Greines for Defendants and Respondents.

## Opinion

POTTER, J.—Plaintiffs Marvin Fish and Francine R. Fish appeal from a judgment in favor of defendants Los Angeles Dodgers Baseball Club and Glen E. Jones, M.D., upon a jury verdict. The complaint was for damages for the wrongful death of plaintiffs' 14-year-old son, Alan, who died following his being struck by a line-drive foul while watching a Dodger baseball game. Originally, other defendants were named,[1] but they were dismissed prior to submission of the case to the jury. The complaint asserted liability against the Dodgers on two theories: (1) failure to provide the decedent "with a safe place to witness the ball game" (first cause of action), and (2) providing emergency medical services to decedent in a negligent manner (second cause of action). Defendant Glen E. Jones, M.D., the doctor who operated the emergency medical facility at the stadium, was also named in the malpractice cause of action. The cause of action against defendant Dodgers for failure to provide a safe place to witness the baseball game was disposed of by the court granting a motion for nonsuit as to that cause of action. The case was submitted to the jury solely on the malpractice issues, against Dr. Jones as the allegedly negligent doctor, and against defendant Dodgers as the alleged principal responsible for the negligence of its agent, Dr. Jones. No issue is raised on this appeal as to the propriety of the nonsuit; the sole issue relates to the sufficiency of the instructions with respect to causation between Dr. Jones's alleged negligence and the death of plaintiffs' decedent.

### Facts

Inasmuch as plaintiffs were denied instructions requested by them relating to their theory of the case, we must view the evidence in the light most favorable to their contentions.

"Each party is entitled to have his theory of the case submitted to the jury in accordance with the pleadings and proof (*Cole* v. *Ridings,* 95 Cal.App.2d 136, 144 [212 P.2d 597]), and it is incumbent upon the trial court to instruct on all vital issues involved (*Jaeger* v. *Chapman,* 95 Cal.App.2d 520, 525 [213 P.2d 404]). Viewing the evidence in the light 'most favorable to the contention that the [last clear chance] doctrine is applicable . . . since plaintiff is entitled to an instruction thereon if the

---

[1]These included Citizens Emergency Hospital, a corporation, and Cedars-Sinai Medical Center, a corporation; their relationship to the case will appear in the subsequent statement of facts.

evidence so viewed could establish the elements of the doctrine' (*Selinsky* v. *Olsen,* 38 Cal.2d 102, 103 [237 P.2d 645]; *Hopkins* v. *Carter,* 109 Cal.App.2d 912, 913 [241 P.2d 1063]) . . . ." (*Sills* v. *Los Angeles Transit Lines,* 40 Cal.2d 630, 633 [255 P.2d 795]; see also *Selinsky* v. *Olsen,* 38 Cal.2d 102, 103 [237 P.2d 645].)

Accordingly, we state as facts the version most favorable to plaintiff, though there was substantial conflicting evidence on many vital issues.

### The Injury, Treatment and Death of Decedent

Plaintiffs' decedent was struck behind and above the left ear by a hard-hit line-drive foul, at approximately 7:45 p.m., on the evening of May 16, 1970. His adult companion observed that the boy remained slumped forward with his chin on his chest, "out like a light," for approximately one minute. Then he stretched and groaned and commenced speaking in an unintelligible fashion. This was followed by a period during which he stuttered and was unable to speak without long pauses between words. An ice pack, furnished by someone inside the visitors' dugout, was applied to the boy's head. A short while later an usher came and returned with two ambulance attendants. By this time, decedent's condition was somewhat improved, and his speech was normal.

The ambulance attendants escorted decedent to the ball park emergency first aid station. On the way he manifested some loss of balance, "as if he was intoxicated," but by the time he arrived, "he seemed to be walking quite normal." Dr. Jones, who was seated in the press box at the time the foul ball was hit, saw it enter the stands, thought it was a hard-hit ball, and observed that it had struck someone. He, therefore, returned to the first aid station. He arrived there shortly before decedent. Upon decedent's arrival, Dr. Jones was informed that decedent had been hit in the head by a foul ball. He took decedent's pulse, felt the left side of his head, and examined the site where the ball had hit. Thereupon, with a flashlight, he examined decedent's eyes, ears and throat and he also tested decedent's reflexes with his hand. Dr. Jones did not take decedent's blood pressure nor did he inquire as to the manner in which decedent had reacted after being hit; that is, Dr. Jones did not ask whether decedent had been rendered unconscious or dazed, nor did he inquire into decedent's ability to speak or walk in the period immediately following the accident. Decedent was kept in the first aid room for a

period of approximately five minutes, he was advised that he had a bump on the head but appeared to be all right and that he could return to his seat and "resume the activities." Decedent was not advised to restrict his activities, to return to the first aid station, or to see a doctor.

Decedent and his adult companion returned to their seats and watched the rest of the game. In the course of the remaining six innings, decedent chased another foul ball and went to the concession stand to purchase food. During this period, his speech and physical movements appeared normal. The game ended at about 10 p.m., but decedent stayed for an additional 10 minutes. During this interval, decedent proceeded to the roof of the Dodger dugout and leaned down, attempting to get someone's attention. On the way out to the camper in which decedent had been brought to the game, he grabbed his adult companion's arm, and commenced crying and shaking. His speech disability reappeared and he had to be helped to the camper where he lay down while being driven home, a drive which took approximately 40 minutes.

Upon decedent's arrival at home, plaintiffs were advised of the incident. They promptly took decedent to Citizens Emergency Hospital where they were advised that medical attention would not be available for about an hour. At this time decedent was pale and limp and "appeared to have little control of his muscular part of his body."

Plaintiffs then drove to Cedars-Sinai Medical Center, which took somewhat less than half an hour. Upon arrival at Cedars, decedent was wheeled into the reception area in a wheel chair. He was slumped in the chair with his head down. At the reception desk, he vomited. Plaintiffs were advised that the hospital could not give the boy medical attention. He was then driven to Childrens Hospital, some two to four blocks distant. Decedent was admitted to the emergency clinic at Childrens Hospital at about 11:50 p.m. Decedent was treated in the emergency clinic until 1:30 a.m., May 17, when he was transferred to a holding ward, a unit which provides treatment less intensive than that of an intensive care unit but more intense than a regular ward. At approximately 2:30 a.m., the presence of Dr. Johnson, a neurosurgeon, was procured. He examined decedent and undertook his care. At 3:15 a.m., decedent was placed in a regular ward, and a drug for the control of cerebral edema was administered. At 5 a.m., decedent was again seen by Dr. Johnson who noted he was "becoming more alert" and made no change in the treatment. By 10 a.m., when Dr. Johnson again examined

decedent, a deterioration in his condition was noted to the point that performance of a cranial angiogram[2] was indicated. When the angiogram was completed about 12:20 p.m., it revealed the existence of a mass in the left parietal area of decedent's brain. Dr. Johnson then placed decedent in an intensive care unit, obtained plaintiffs' consent to perform a craniotomy, but did not in fact perform such surgery. At 9:30 p.m., May 17, decedent suffered a convulsion which rendered him decerebrate and made his condition terminal; death followed on May 20 at 1 p.m., when artificial support systems were turned off.

An autopsy was conducted. It revealed that when decedent was struck by the baseball, he suffered a hairline fracture of the outer plane of his skull and a depressed fracture of the inner plane, portions of which protruded through the covering membrane and into the brain tissue. A small artery in the covering tissue was severed and brain tissue was contused and lacerated by the displaced portions of the fractured skull, disrupting blood vessels therein and inducing intracerebral hemorrhage. This intracerebral bleeding continued from approximately the time of the accident to at least until the time decedent suffered the convulsion. As the brief of respondent Jones states, the medical cause of decedent's death "was the failure to contain the intracerebral hemorrhage and thus to eliminate or reduce the buildup of pressure prior to the time that he became decerebrate."

*The Evidence of Negligence*

The testimony of plaintiffs' two experts clearly supported plaintiffs' claim that Dr. Jones had not treated decedent in accordance with the applicable standard of care. Dr. Woods was of the opinion that the standard of care required Dr. Jones to obtain full information concerning the patient's reaction immediately following the injury and upon ascertaining that symptoms of the nature above recited had been manifest, to send the patient to a hospital facility where he would be immobilized under close observation and X-ray and other hospital diagnostic techniques could be applied. Dr. Coulter was also of the opinion that Dr. Jones did not meet the standard of care. He testified that the standard of care required that a doctor make an inquiry to ascertain whether or not there was a history of unconsciousness and upon ascertaining that unconsciousness had ensued, "[s]end that patient in an

---

[2]A surgical procedure in which a radiopaque substance is injected into the carotid artery and X-rays are taken as the substance is distributed through the vessels of the brain.

ambulance to the nearest facility, with X-rays, so that X-rays of the skull might be obtained and the patient examined and admitted for 24 hours of observation in the hospital."

*The Causation Evidence*

Plaintiffs' two medical experts gave testimony upon which plaintiffs relied to show that Dr. Jones' negligence was a legal cause of decedent's death. Both doctors expressed the opinion that Dr. Jones' failure to immobilize decedent during the period immediately following his injury, as a result of which he engaged in normal activities, probably prevented the hemorrhage from spontaneously stopping as a result of the body's normal healing processes. Dr. Woods testified that if decedent "had been, hypothetically, put at rest after arriving at the first aid station, instead of being allowed to move about freely," it was "more likely than not" that the bleeding would "probably have stopped prior to the demise," and that "if the bleeding had stopped during that period where he had no symptoms, and the intracranial pressure hadn't started to build up, then he'd be alive and running around today" without "resultant paralysis or any untoward sequelae."

Dr. Coulter stated his medical opinion that "if the patient had been at bed rest immediately after being seen in the first aid station," the bleeding would be "if not stopped minimized." On cross-examination by counsel for defendant Jones, the following question and answer occurred: "Q. Am I correct in understanding that you are unable to formulate a medical opinion that the bleeding would have stopped? A. No. You are incorrect in that assumption."

Reasons were given in support of these opinions. These included the fact that "physical activity of the body would tend to prevent proper coagulation of blood at the injured portion of the vein," and "interfere with the clotting mechanism," by "dislodging of already formed clots . . . through changes of position, particularly in jarring of the head." In addition, the lowering of the patient's head "impairs the return of blood from the head," increasing intracranial pressure.

The effect of the testimony of plaintiffs' doctors in this respect was that Dr. Jones' failure to immobilize decedent probably resulted in his condition changing from one where he would recover spontaneously to one where he could only survive as the result of emergency surgery.

Plaintiffs' experts further testified that even if the hemorrhage grew to potentially lethal proportions, the opportunity to diagnose such progression and perform the necessary surgery would have been substantially enhanced and probably would have changed the outcome. As Dr. Coulter put this: "A. I would expect a lesser chance of intracerebral bleeding of occurring. I would expect a lesser chance of it growing to a size which required emergency surgery. And if it did, under observation, with a longer period of observation and monitored vital signs, one could proceed with studies such as angiography and surgery much earlier, and thus affecting the outcome. And with those things in mind, I would have to say yes, it would have. Q. It would have changed the outcome? A. It would have changed the outcome."

The same view was expressed by Dr. Woods when he gave an answer as follows: "Well, there is an increased chance that it would have stopped from the position in the bed rest alone. However, if it developed, it would be developing under closer observation, and the surgery and tests would have been carried out sooner, which adds the—hand-in-hand with it goes the increased chance of survival."

In cross-examination, counsel for defendant Jones elicited opinions from both Dr. Coulter and Dr. Woods that after decedent arrived at Childrens Hospital, there was still time to diagnose his need for emergency surgery and by performing such surgery to relieve the hemorrhage. Dr. Woods testified in this respect as follows: "Q. And in your opinion, there was an opportunity to relieve that hemorrhage at Childrens Hospital? A. Correct."

The cross-examination of Dr. Coulter in this respect was much more extensive. He testified as follows: "Q. In your opinion, at the time the young man was first at Children's Hospital, there were indications for angiography. Angiography would have made surgery necessary; and surgery would have saved his life, correct? A. That is basically my opinion, yes, sir. Q. And thereafter, the medical staff at Children's Hospital had repeated findings on neurological examination brought to their attention that indicated throughout the night that angiography was indicated, and yet they did not follow up on those findings; is that correct? A. That's correct. Q. Is it your opinion, then, that in fact, the medical staff at Children's Hospital had repeated opportunities to obtain information which would have led to surgery and survival over the course of the first several hours that the young man was in the hospital,

but that they failed to follow up on it? A. That's my inference from reading these records, yes, sir."

Dr. Coulter's testimony thus suggested, though he did not directly so state, that the failure of the staff at Childrens Hospital to detect the necessity for and perform the emergency surgery which would have led to survival was negligent.

*The Agency Evidence*

The evidence bearing upon the liability of defendant Dodgers for the negligence of Dr. Jones tended to indicate that an independent contractor relationship existed between them. Plaintiffs relied more upon the claim of ostensible agency based upon Dr. Jones' having been held out as the doctor through whom defendant Dodgers provided emergency medical care. It is unnecessary to discuss this evidence, however, inasmuch as defendant Dodgers does not claim that it was insufficient to sustain a verdict holding them liable for Dr. Jones' negligence.

*The Oral Argument*

During the course of oral argument, counsel for defendant Jones exploited the cross-examination testimony of plaintiffs' experts that decedent could have been saved by emergency surgery at Childrens Hospital. The first reference to this was as follows: ". . . The burden is on the plaintiffs to establish that if Dr. Jones had done what they claim he should have done, which was simply hospitalize the boy for observation, that he would have survived; and that except for Dr. Jones' failure to hospitalize him, he would have survived. In other words, unless they can show that at the time Alan Fish arrived at Childrens Hospital, it was too late to do anything for him, then the failure of Dr. Jones, if it was a negligent failure, to hospitalize him earlier, had nothing to do with his death.—"

Counsel for plaintiffs objected to this statement and requested that the court admonish the jury to disregard it. The court declined to do so.

In further argument, counsel for defendant Jones stated:

"We know that the contention is that Alan Fish would have survived if he had been hospitalized immediately after he had been seen in the first aid station. But we also know that both Dr. Woods and Dr. Coulter have testified that there was no reason for him not to survive if surgery had been performed any time within a period of many hours after he arrived at Childrens Hospital. And so the point that I am trying to make here is the plaintiffs, according to their own expert testimony, have been completely unable to prove that but for the negligence of Dr. Jones, Alan Fish would have survived, because in fact, when he arrived at Childrens Hospital, although it was at 11:50 in the evening, and they contend that he should have been hospitalized at about eight in the evening, their experts have testified he was in no imminent peril; he was in no immediate danger of dying; that at that time, or according to Dr. Woods, all the way up until 9:30 on Sunday evening, when he had the convulsion and became decerebrate, there was no reason to suspect that surgery would not have been successful in saving his life.

"Dr. Coulter has testified to the same thing, that when he arrived at Childrens Hospital, it was not too late to save his life. There was no significant chance that surgery would be unsuccessful. In his opinion, if surgery had been performed at that time, or over a period of many hours thereafter, he would anticipate a virtually complete recovery."

In amplification of this argument, counsel for defendant Jones further stated: "You will recall that Dr. Coulter testified that he felt, under the circumstances, the personnel at Childrens Hospital probably should have obtained an angiogram when the young man arrived there—and just briefly, again, this would have been the study where they injected some dye in the blood circulating to the brain; take a picture and see what abnormalities showed up—and in his opinion, the abnormalities that would have showed up at that time would have been basically the same abnormalities that showed up when the angiogram was done some 11 or 12 hours later, somewhere in that vicinity. Or to put it the other way around, that he does not think that there was any significant—or would have been any significant difference in the appearance of the brain injury on the angiogram over that first period of about 12 hours that he was in the hospital; and that based on the appearance of that angiogram, there

was no reason at all to believe that he would not have survived with relatively minimal residual effects if surgery had been performed there. And I think you will recall that both Dr. Woods and Dr. Coulter testified that in their opinion, surgery was indicated on the basis of the angiogram."

*The Causation Instructions*

In view of the above argument having been made, counsel for plaintiffs requested that the court instruct in accordance with BAJI No. 3.77 (Concurring Causes), BAJI No. 3.79 (When Third Party's Intervening Negligence Becomes Superseding Cause), and BAJI No. 14.66 (Additional Harm Resulting From Original Injury). These requests were denied, and the only instruction given with respect to causation was BAJI No. 3.76, modified to read as follows: "A legal cause of a death is a cause which is a substantial factor in bringing about the death."

The jury was instructed on Friday, September 21, and retired about 11 a.m. They did not reach a verdict by the end of the day. On Monday, September 24, about 11:30 a.m., the jury sent the following note to the court:

"Judge Stillwell.

"Can you please give us a clearer definition of the term 'Substantial Factor'

Johnson
Foreman."

The following written response was given to the jury by the judge at 1:50 p.m.:

"After conferring with all counsel, the court feels he can not give you any clearer definition of 'substantial factor'.

P.S."

The jury was unable to reach a verdict by the end of that day. On Tuesday, September 25, at about 11:30 a.m., the jury requested that the instructions be reread in their entirety. After this was done, the jury resumed deliberations and at 4:01 p.m., sent a note to the court as follows:

"It seems that we are at a point where further discussion will not change the voting. The vote is not sufficient at present to bring a verdict

_R.G. Hamlin_
Foreman "

The jury returned to the courtroom and the following colloquy between the trial judge and the foreman occurred: "And from this, I gather that you are saying to me that you feel that further deliberation would avail you nothing? THE FOREMAN: That is our opinion, sir. THE COURT: Sir, I would like for you to, if you can, pinpoint for me—well, does the fact that you are unable to reach a verdict have any relationship, in your opinion, to the first question that you presented to me yesterday? I am asking only the foreman. THE FOREMAN: Partly, yes, sir—not a substantial influence, yes."

The jury was asked to deliberate further and on Wednesday, September 26, at about 2 p.m., brought in the verdict against plaintiffs and in favor of defendants Jones and the Dodgers. This appeal is from the judgment entered thereon in open court.

### Contentions

Plaintiffs contend (1) it was error to refuse the requested instructions in view of the argument made by defendants *re* causation and the intervening conduct of the Childrens Hospital staff, and (2) inasmuch as this error resulted in the jury finding no liability on the part of Dr. Jones and the sole basis for the assertion of liability against defendant Dodgers was vicarious liability for Dr. Jones' negligence, reversal is also required as to defendant Dodgers.

Defendants contend that the jury was adequately instructed and that their argument on causation was not erroneous. Defendant Dodgers contends that the judgment should be affirmed as to it regardless of any error with respect to the liability of defendant Jones.

### Plaintiffs Were Entitled to an Instruction That the Intervening Conduct of the Childrens Hospital Staff Contributing to Decedent's Death Was No Defense

It was plaintiffs' right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court. In *Phillips v. G. L. Truman Excavation Co.,* 55 Cal.2d 801 [13 Cal.Rptr. 401, 362 P.2d 33], a judgment upon a jury verdict for plaintiff was reversed where the trial court refused to give an

instruction on contributory negligence. The court said (55 Cal.2d at p. 806): "The key question on this appeal is whether there was any substantial evidence on the issue of plaintiff's contributory negligence. If there was evidentiary support for this defense, it was error of a most serious nature to have refused to give the proffered instructions. It is hornbook law that each party to a lawsuit is entitled to have the jury instructed on all of his theories of the case that are supported by the pleadings and the evidence. It is incumbent upon the trial court to instruct on all vital issues involved. (See *Sills* v. *Los Angeles Transit Lines,* 40 Cal.2d 630, 633 [255 P.2d 795], and cases cited; *Daniels* v. *City & County of San Francisco,* 40 Cal.2d 614, 623 [255 P.2d 785]; *Rideau* v. *Los Angeles Transit Lines,* 124 Cal.App.2d 466, 469 [268 P.2d 772].)"

In *Christian* v. *Bolls,* 7 Cal.App.3d 408 [86 Cal.Rptr. 545], the same view was expressed. The court said (7 Cal.App.3d at pp. 415-416):

" '. . . a party has a *right* to instructions on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence.' (2 Witkin, Cal. Procedure (1954) § 52, p. 1780.) 'Each party is entitled to have his theory of the case submitted to the jury in accordance with the pleadings and proof [citation], and it is incumbent upon the trial court to instruct on all vital issues involved [citations].' (*Sills* v. *Los Angeles Transit Lines,* 40 Cal.2d 630, 633 [255 P.2d 795].)

"A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. (*Selinsky* v. *Olsen,* 38 Cal.2d 102 [237 P.2d 645].)"

██ If the expert testimony above recited is viewed in the manner "most favorable" to plaintiffs, it supports a theory of recovery in respect of which the intervening conduct of the Childrens Hospital staff, whether or not it was negligent, was irrelevant to the issue of legal cause.

Plaintiffs' theory, supporting the claim that Dr. Jones' negligence was a legal cause of decedent's death, was that by negligently failing to ascertain his symptoms and consequent need for immediate hospitalization and allowing him to engage in normal activity, Dr. Jones converted decedent from a patient who probably would have survived without emergency surgery to a patient whose only hope of survival was

dependent upon emergency surgery, and diminished the likelihood that such emergency surgery would occur. This theory of recovery placed Dr. Jones in a special category in respect of the intervening conduct of the Childrens Hospital staff. The staff's conduct consisted of a failure to protect decedent from the harm (death) directly threatened by the negligent conduct of Dr. Jones. In the usual case, the intervening conduct is the immediate cause of the injury. In such cases, nonsupersession depends upon the foreseeability of such conduct or upon its being not extraordinarily negligent. But these requirements have no application where the intervening conduct is a failure to protect from harm threatened directly by defendant's negligence. This is recognized in the use note to BAJI No. 3.79, governing intervening causes which are "the immediate cause of an injury."[3] In that use note, the following appears:

"The rules relating to other kinds of intervening causes as superseding causes as set forth in sections 442-453 of Restatement, Second, Torts are:

".　　.　.　.　.　.　.　.　.　.　.　.　.　".　.　.　.　.

"3. Third person's failure to prevent harm:

"a. When not superseding (Section 452[1]).

"b. When superseding (Section 452[2])."[4]

---

[3]BAJI No. 3.79 reads as follows:
"If you find that defendant [. . . (first actor) . . .] was negligent and that his negligence was a substantial factor in bringing about an injury to the plaintiff but that the immediate cause of the injury was the negligent conduct of [a third person] [defendant . . . (second actor) . . . ], the defendant [ . . . (first actor) . . . ] is not relieved of liability for such injury if:
1. At the time of his conduct defendant [ . . . (first actor) . . . ] realized or reasonably should have realized that [a third person] [defendant . . . (second actor) . . . ] might act as he did; or
2. A reasonable person knowing the situation existing at the time of the conduct of the [third person] [defendant . . . (second actor) . . . ] would not have regarded it as highly extraordinary that the [third person] [defendant . . . (second actor) . . . ] had so acted; or
3. The conduct of the [third person] [defendant . . . (second actor) . . . ] was not extraordinarily negligent and was a normal consequence of the situation created by defendant [ . . . (first actor) . . . ]."

[4]Restatement Second of Torts (1965) section 452, page 486, reads as follows:
"(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.
"(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."

■ The distinction between situations governed by the rules relating to intervening causes which are the "immediate cause of the injury" and those governed by the rules relating to intervening conduct constituting failure to prevent harm is that the former rules apply when the first actor's negligent conduct is not sufficient in and of itself without intervention of others' conduct to produce the injury or death, whereas in the latter the first actor's conduct will itself cause the injury or death unless successful protective action is taken.

For example, illustration 4 to section 452, is as follows: "4. An automobile negligently driven by A strikes B, and leaves him on the highway, unconscious and slowly bleeding to death. C, a passing motorist, stops, looks over the situation, and decides to drive on without doing anything to aid B. B bleeds to death. Regardless of whether C is under any duty to B to render such aid, his failure to do so is not a superseding cause which will relieve A of liability for the death of B."

As is made clear by comment "c" to section 452, the result in illustration 4 would remain unchanged if the passing motorist undertook to stop the flow of blood but failed to do so. Comment "c" reads: "The rule stated in Subsection (1) applies not only where the third person makes no effort to avert the harm, but also where he makes such an effort, but the action which he takes is insufficient, or otherwise unsuccessful, in averting the harm."

Comment "b" explains the basis upon which the failure of preventive effort is not deemed a superseding cause. That comment reads in part as follows: " *b.* Subsection (1) states the rule, applicable in the ordinary case, that the failure of the third person to act to prevent harm to the other threatened by the original actor's negligent conduct, is not a superseding cause of such harm, and so does not relieve the actor of liability for the harm which he has in fact caused. *If the third person is under a duty to the other to take such action, his failure to do so will subject him to liability for his own negligence, which is concurrent with that of the actor,* for the resulting harm which he has failed to prevent; *but his failure to perform his duty does not relieve the original actor of liability for the results of his own negligence. . . .*" (Italics added.)

■ The applicability of the rule stated in Restatement Second of Torts, section 452, is not altered by the fact that in this case Dr. Jones

was not the first actor in relation to decedent's injury. The principle stated is applicable to any actor's negligent conduct which is followed by a failure to protect from harm.

Subsection (1) of section 452 has been approved and applied by our Supreme Court. In *Stewart v. Cox,* 55 Cal.2d 857 [13 Cal.Rptr. 521, 362 P.2d 345], plaintiffs, who were damaged as the result of water leaking from a defectively constructed swimming pool, sued the general contractor (Wahlstrom), the gunite and reinforcing steel subcontractor (Cox), and the plastering subcontractor (Skinner). Wahlstrom and Skinner settled and Cox was found liable upon trial to the court. The damage resulted from water which leaked over a two-month period during which Wahlstrom had attempted to repair cracks without success. Plaintiffs were awarded a judgment for the full amount of the damage less the sums received in settlement from Wahlstrom and Skinner. On appeal, Cox claimed that Wahlstrom "negligently failed to make effective repairs or prevent refilling of the pool" (55 Cal.2d at p. 863), and that this "constituted a superseding cause which prevents Cox from being liable" (*Id*). In affirming, the court said (55 Cal.2d at pp. 863-864):

"The rules set forth in sections 442-453 of the Restatement of Torts for determining whether an intervening act of a third person constitutes a superseding cause which prevents antecedent negligence of the defendant from being a proximate cause of the harm complained of have been accepted in California. (See, for example, *McEvoy v. American Pool Corp.,* 32 Cal.2d 295, 298-299 [195 P.2d 783]; *Mosley v. Arden Farms Co.,* 26 Cal.2d 213, 219 [157 P.2d 372, 158 A.L.R. 872].)

"Under these rules the fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable man knowing the situation existing when the act of the third person is done would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent. (See Rest., Torts, § 447;[2] *Stasulat v. Pacific Gas & Elec. Co.,* 8 Cal.2d 631, 637 [67 P.2d 678].) *The fact that a third person does not perform his duty to protect the plaintiff from harm,*

---

"[2]Section 447 of the Restatement of Torts provides: 'The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial

*either because he makes no effort or through his negligence does not succeed, is not a superseding cause. (Rest., Torts, § 452.[3])*

"Although the evidence may point to negligence of Wahlstrom, the record does not establish that Wahlstrom actually knew that the condition was dangerous. *The negligence of Wahlstrom, if any, consisted of its failure to perform its duty to the Stewarts to protect them from the harm threatened by the negligence of Cox,* and its conduct was not, as a matter of law, highly extraordinary. Therefore it did not constitute a superseding cause, and the finding of the trial court that plaintiffs were damaged as a direct and proximate result of Cox's negligence must be upheld. . . ." (Italics added.)

The foregoing quotation makes it apparent that alternative grounds for affirming the judgment were stated. The requirements for intervening negligence to be a superseding cause under Restatement Second of Torts, section 447, are stated separately from the principle embodied in section 452. Both these rules are found to support the court's finding.

At the time *Stewart* v. *Cox* was decided, section 452 did not contain the exception now stated in subsection (2) thereof. Apparently, the caveat expressed in subsection (2) was stated as the result of the existence of authorities in various jurisdictions in which, under exceptional circumstances, the general principle had been found inapplicable. As stated in comment "d" to subsection (2): "[It] covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence. The shifted responsibility means in effect that the duty, or obligation, of the original actor in the matter has terminated, and has been replaced by that of the third person."

---

factor in bringing about, if . . . (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.'

"[3]Section 452 of the Restatement of Torts provides: 'Failure of a third person to perform a duty owing to another to protect him from harm threatened by the actor's negligent conduct is not a superseding cause of the other's harm.' Comment c states: 'The rule stated in this Section applies not only where the third person makes no effort to perform his duty, but also where through his negligence his attempt to do so is unsuccessful.' "

Comment "f" concedes: "It is apparently impossible to state any comprehensive rule as to when such a decision will be made." We have considered all of the illustrations set forth under subsection (2) and all of the cases upon which they are based,[5] and we find that none involved a situation remotely comparable to the case at bench. We conclude that to apply the exception to this case would be in effect to destroy the rule.

There is, moreover, no decision of our Supreme Court recognizing the propriety of the exception stated in subsection (2). As above noted, when approved by our Supreme Court, the section contained no such caveat. We, therefore, conclude that under the facts of this case, the rule of law applicable rendered irrelevant the existence or degree of the negligence, if any, of the Childrens Hospital staff. Under that rule, the claimed negligence of Dr. Jones and the conduct of the Childrens Hospital staff were concurrent causes which were operative at the moment of injury. It was no defense to plaintiffs' claim based on Dr. Jones' negligence that the conduct of the Childrens Hospital staff was also a substantial factor contributing to decedent's death.

Plaintiffs requested an instruction which would have advised the jury of this applicable rule. BAJI No. 3.77[6] adequately and correctly states the law governing concurring causes which, as above stated, was applicable.

The giving of such an instruction became necessary when counsel for defendant Jones advanced the wholly untenable argument that defendant Jones' negligence could not be a legal cause of decedent's death in view of the fact that when decedent arrived at Childrens Hospital, it was "not too late to save his life" by surgery which was indicated by appropriate diagnostic procedures. Counsel for plaintiffs was, of course, entitled to and did state his disagreement with the offending argument of defense counsel. At this point he was interrupted by counsel for defendant Jones who stated, "Well, I object to Mr. Jacobs' statement that that is not the law. It is the law," to which counsel for plaintiffs replied,

---

[5]These are listed in Restatement Second of Torts, Appendix (1966), under section 452, "Reporter's Notes."

[6]As proposed by plaintiffs, BAJI No. 3.77 read as follows: "There may be more than one [proximate] [legal] cause of an injury. When negligent conduct of two or more persons contributes concurrently as [proximate] [legal] causes of an injury, the conduct of each of said persons is a [proximate] [legal] cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. [It is no defense that the negligent conduct of a person not joined as a party was also a [proximate] [legal] cause of the injury.]"

"That is not the law." At this point the court advised the jury that what was said by the lawyers "is not evidence, and it is not the law," and that "the law will come from me." However, no instruction resolving the dispute between counsel was forthcoming, and the jury was left with no guidance as to how to resolve the conflict between counsel.

Defendants argue that the instructions proposed were not in the proper form to be used by the court, and rely upon the principle that in order to complain on appeal an aggrieved party must show that he requested "a specific and correct instruction." (*Switzer v. State of California,* 269 Cal.App.2d 627, 636 [75 Cal.Rptr. 371].) They add that though the trial court has the power to modify a requested instruction, it has no duty to make such modification and may properly reject a requested instruction that is erroneous or incomplete. (*Shaw v. Pacific Greyhound Lines,* 50 Cal.2d 153, 158 [323 P.2d 391].) The rule of these cases, however, is not intended to sanction the kind of nitpicking which defendants' criticism of proposed BAJI instruction No. 3.77 entails. Defendants contend that the instruction is incorrect because "death" should be used in place of "injury." That modification should have been made, but it is apparent that it would have been made by the court if the instruction were given; such modification had already been made to BAJI No. 3.75. Defendants also complain that "inapplicable bracketed alternatives" were not deleted. The only language which appropriately should have been stricken therefrom were the four "[proximate]" alternatives to "[legal]" cause. Several other instructions which contained the same alternatives between "proximate" and "legal" had already been appropriately marked by crossing out "proximate." It was a simple clerical operation to do the same with BAJI No. 3.77. The bracketed alternative, "It is no defense that the negligent conduct of a person not joined as a party was also a legal cause of the injury," was particularly apposite and should have been given. The situation, therefore, is governed by the holding in *Laird v. Moss,* 173 Cal.App.2d 48, 53 [342 P.2d 463]: "The few redundant words could have been crossed out with the stroke of a pen. The imperfections were on a par with clerical errors that are easily corrected. Such trivial inaccuracies do not justify the refusal of an instruction where the result would be to leave the jury inadequately instructed on a material issue in the case. The instruction should have been corrected by the [this] court and given."

There is no need to discuss the claimed defects in the form of proposed BAJI instructions Nos. 3.79 and 14.68. As is apparent from the

above discussion, we do not consider these instructions apposite to the situation presented by plaintiffs' theory of the case.

The failure to give BAJI instruction No. 3.77 was highly prejudicial. Defendants' argument to the contrary consists mainly of a reassertion of the erroneous argument made to the jury that "the evidence virtually compels a determination that Dr. Jones was not a responsible cause in fact of death because at the time decedent arrived at Children's Hospital, and for twenty-one hours thereafter, his condition was operable and, if surgery had been performed, he would have survived. [Fn. omitted.]" It is apparent from the length of their deliberations and their repeated question concerning the meaning of "substantial factor," that the jury were bewildered by the conflicting arguments of counsel and the failure of the court to say who was correct. ■ Error in failing to give an instruction covering a party's theory of the case as to which there is substantial evidence is inherently prejudicial. As our Supreme Court said in *Phillips* v. *G. L. Truman Excavation Co., supra,* 55 Cal.2d 801, 808: "The plaintiff urges that even if error was committed in the refusal to give the instructions, such error was not prejudicial under article VI, section 4½ [now § 13] of the Constitution. Such contention is unsound. If there was evidence of contributory negligence, and we have held there was, even though the trial court thought it was slight as compared to the evidence of negligence of the defendants, then such error in refusing to give the proffered instructions obviously and necessarily was prejudicial. The trial judge had no legal right to weigh the conflicting evidence by refusing the instructions. When he did so the defendants were denied their constitutional right to a jury trial on the issue. Such an error cannot be cured by the beneficent provisions of article VI, section 4½."

In *Self* v. *General Motors Corp.,* 42 Cal.App.3d 1 [116 Cal.Rptr. 575], the failure to give a superseding cause instruction when that issue was raised by the evidence, was held prejudicial error. In holding that the trial court prejudicially erred in refusing to give the instruction, the court said (42 Cal.App.3d at p. 10): "Although the court instructed the jury on general cause and on concurrent cause (plaintiffs' theory of the case), it failed to clarify for the jury the issue of superseding cause. Causation, both legal and factual, presents a difficult conceptual problem for jurors—and for trial judges and appellate judges, too, for that matter. Since the court's general instruction on causation did not go into the circumstances of this particular case but dealt with the defense of superseding cause by negative implication only, the jury may well have

overlooked that defense in untangling the issues and arriving at its verdict. A trial court should not require a party to rely on abstract generalities in presenting its legal theory of the case to the jury, but should instruct the jury on vital issues in terms that relate to the particular case before it. . . ." (Fn. omitted.)

The judgment in favor of defendant Jones must, therefore, be reversed.

### The Judgment in Favor of Defendant Dodgers Must Also Be Reversed

■ The jury was instructed on vicarious liability of the principal for the acts of his "actual or ostensible agent" and the basis upon which ostensible agency might be found. Defendant Dodgers does not contend that the evidence was insufficient to go to the jury on these issues. It argues, however, that despite reversal of the judgment as to defendant Jones, it should be affirmed as to defendant Dodgers because "[i]t is perfectly rational . . . to assume that the jury found there to be neither an actual nor an ostensible agency relationship at all existing between Dr. Jones and the Los Angeles Dodgers, while at the same time finding that Dr. Jones was negligent but that his negligence was not a legal cause of the death of appellants' decedent." It is pointed out that such findings would be fully supported by the evidence. On this basis, defendant Dodgers asserts that the verdict in its favor should not be disturbed because on one issue, unaffected by any error, it is supportable. *Hume* v. *Fresno Irr. Dist.*, 21 Cal.App.2d 348, 356-357 [69 P.2d 483], is cited and quoted as follows: "The rule is settled in this state that where several issues in a cause are tried and submitted to a jury for its determination, a general verdict may not be disturbed for uncertainty, if one issue is sustained by the evidence and is unaffected by error. [Citations.] When a situation of this character is presented it is a matter of no importance that the evidence may have been insufficient to sustain a verdict in favor of the successful party on the other issues or that reversible errors were committed with regard to such issues. (*Big Three Min. & Mill. Co.* v. *Hamilton*, 157 Cal. 130, 141 [107 Pac. 301, 137 Am. St. Rep. 118].)"

The principle relied upon is a sound one. Its application to the instant case is, however, unjustifiable. The jury was clearly instructed, "[I]f you

find that defendant Dr. Jones is not liable, then neither defendant is liable." It is apparent, therefore, that there was no occasion for the jury to consider the issue of agency or ostensible agency inasmuch as they found Dr. Jones not liable. There is in no real sense any uncertainty as to the basis for the verdict in favor of defendant Dodgers. Consequently, it must stand or fall upon the propriety of the verdict in favor of defendant Jones. Prejudicial error having affected that verdict, the verdict in favor of defendant Dodgers must also be reversed.

The judgment is reversed and remanded for further proceedings consistent with the view above expressed.

Allport, Acting P. J., and Cobey, J., concurred.

A petition for a rehearing was denied April 23, 1976, and the petition of respondent Los Angeles Dodgers Baseball Club for a hearing by the Supreme Court was denied May 26, 1976.