[Civ. No. 25947. Fourth Dist., Div. Two. Apr. 12, 1983.]

MARY ERFURT, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant and Appellant.

COUNSEL

Richard G. Rypinski, Robert F. Carlson, Joseph A. Montoya, Robert L. Meyer and Robert W. Vidor for Defendant and Appellant.

Greene, O'Reilly, Agnew & Broillet and Gary M. Paul for Plaintiff and Respondent.

OPINION

**KAUFMAN, J.**—Defendant State of California appeals from a judgment entered in favor of Mary Erfurt (plaintiff) following a jury trial. While using a state highway, plaintiff struck a guardrail in front of a concrete pillar supporting an overcrossing on the highway. Plaintiff sued the state for her personal injuries, alleging the state allowed a dangerous condition to exist on a public highway and failed to warn about it. Plaintiff was awarded damages in the net amount of $108,000, the jury having determined the state was 60 percent at fault and plaintiff 40 percent at fault.

FACTS

On the morning of December 3, 1976, plaintiff set out for Mexico with her friend, Trixie Haney, so that Mrs. Haney could obtain medicine for her arthritis. They left around 5:15 or 5:30 a.m.; it was still dark. Plaintiff was driving. While plaintiff had made the trip a few times before, she had not made the trip within the past year. She did not know precisely the route to take, but was relying on Mrs. Haney to give directions.

They soon found themselves heading southeasterly on Highway 60. They were in the middle of three lanes on their side of the freeway.[1] As they went on, the sky began to brighten over the hills ahead of them, but it was still too dark for plaintiff to have on sunglasses. There was no "indication" the sun was already up. As they reached a crest in an uphill climb, however, the sun suddenly shone directly into plaintiff's eyes. It was, she said at trial, like looking directly into a flashlight. Plaintiff took her foot off the gas, pulled the sun visor down, and asked Mrs. Haney to get her sunglasses. She looked down to the side, but found no highway lane markings to guide her. Nor was there any change in the surface of the highway to alert her that she was departing the travel lane. She did not dare change lanes as she knew cars were on both sides. She figured if she kept going straight the road would keep going too.

Suddenly Mrs. Haney yelled something and the car collided with an object in the road. Seconds later plaintiff felt the car hit from the rear.

---

[1]Freeway lanes are numbered from the fast lane out to the slow lanes. The lane nearest the center is the "number one lane"; numbers two and three are further outside the center. The slowest lane of a freeway has the highest number. In this case, plaintiff and her passenger were traveling in the number two lane.

At 7:10 a.m. that morning a call came over the radio in the patrol car of California Highway Patrol Officer Ronald Gyll that there had been an accident. Gyll drove eastward toward the scene. The sun was not visible. As he came over a crest on an uphill climb, he suddenly found the sun directly in his eyes. He put his visor down and blocked the sun with his hand. Still, he could not see directly ahead. He looked to the left to follow the line on that side. The accident scene suddenly loomed directly in front of him. He barely managed to avoid it.

Gyll stopped and looked around. He found plaintiff's car up on a guardrail sitting up on top of the metal. It looked to him as if the car had struck the head of a guardrail which surrounded a pillar which supported an overcrossing. He also found a second car off to the right side of the road. Its driver, a Mr. Jackson, told the officer that he had been blinded by the sun. Gyll concluded that the second car had run into the first car but did only minor damage, running over the rear bumper a bit with its front tire. The main damage to the first car occurred when it struck the guardrail.

Gyll also found 50 feet of skid marks. From this he concluded, based on his training and experience, that the first car had not been traveling too fast. Gyll also found the plaintiff on the right side of her car, attending to her passenger. He concluded that the cause of the accidents was that both drivers had been blinded by the sun. He issued citations to neither.

At trial, Gyll described the scene of the accident. The three-lane freeway on which plaintiff had been traveling splits into a "Y." At the top of this "Y," in the center, is a pillar (sometimes called an "abutment") supporting an overpass for another highway. Surrounding the pillar was a "V"-shaped guardrail. Officer Gyll reported that a person driving in the center lane approaching this "V" would run directly into it if he or she were to continue on a straight course.

Gyll also described the section of freeway before the "Y" intersection. The entire section is upgrade. As one comes over a rise in a hill just before the "Y" one may be in a shadow one moment and find the sun shining into one's face the next. Gyll said that it would not be obvious before coming out of the shadow that the sun would be a problem.

Mr. Harry J. Krueper, a traffic engineer, testified as an expert witness for plaintiff. Krueper had examined the area on December 2, 1980, a day when the sun was in full view and when it would have been in the same position in the sky as it was on the day of the accident.[2] He also described the scene of the accident and the stretch of freeway, built in 1966, leading to it. He said it was peculiar

[2]Actually, Krueper had examined the section on both December 2 and December 3, but found weather conditions on the latter date obstructed the full impact of the sun. However, it did not make any difference because in December there is not much day-to-day movement of the sun.

that there was an abutment sitting directly in line with the path of travel in the center lane. A driver in the middle lane finds himself, as he approaches the guardrail, driving in a lane which suddenly becomes very wide and splits in two. He also said it was peculiar that part of the road veered off to the left. Krueper noted that the effect of the rising sun on a driver going up an incline with a crest in it is different from the effect on a driver on a level plane or going downhill. In such circumstances, the effect of the rising sun as one drives uphill is more abrupt because the driver does not see the sun slowly creep up on the horizon. The freeway would be thus affected by the sun about 20 days out of the year, from 15 to 25 minutes a day.

Krueper also noted that the distance from the guardrail to the point where the striping began was 180 feet. This distance, he felt, did not meet the minimum standard for "channelization." Krueper testified that the minimum standard under these circumstances would have been a minimum of 350 feet. He concluded that this deficiency in channelization, combined with the absence of devices (for example, "bot dots"[3]) to both guide and warn traffic away from the abutment, created a dangerous condition.

Krueper elaborated on the kinds of devices which would have provided plaintiff with proper warning of the approaching guardrail. Wider striping, painted a greater distance from the abutment, could have been used to delineate the separating roadways. Chevrons might have been painted in the area between the two separating roadways for increased visibility. "Noise attenuaters," such as bot dots could have been put in the same area, giving drivers warning that they were not where they were supposed to be, regardless of visibility. Had the channelization not been deficient, and chevrons and bot dots been employed, Krueper believed with reasonable probability that the accident would have been avoided.

## CONTENTIONS

The state makes four contentions on appeal: (1) plaintiff failed to produce substantial evidence of a dangerous condition under Government Code section 835. (2) The condition of the highway could not, as a matter of law, be a proximate cause of the accident. (3) The evidence fails to prove notice of the alleged dangerous condition. (4) The "weather immunity" of Government Code section 831 provides a complete defense to the alleged dangerous condition. If any of these contentions were meritorious reversal would be required. We have determined, however, that none of the contentions are well taken.

---

[3]Bot dots are small round white domes which typically appear in sets of fours separating the lanes on California freeways. They are to be distinguished from reflectors, which also separate lanes, but which are square.

## SUBSTANTIAL EVIDENCE OF DANGEROUS CONDITION

■ The state asserts the evidence did not show a dangerous condition[4] because plaintiff only presented "opinion testimony of a different striping plan and warning devices." The state argues that the lack of these things was not proof of a dangerous condition—at best the lack was only probative of one engineer's opinion on how the roadway could have been made safer. We do not agree.

Plaintiff's expert, Krueper, testified that the combination of improper "channelization" with the absence of devices to properly warn of and guide a driver around the abutment in the middle of the freeway constituted a dangerous condition at certain times. The state's characterization of Krueper's testimony as simply presenting an "alternative design of traffic control devices which he thought would have obviated the hazard due to sun glare" is not well taken. Krueper testified that the pattern of traffic control *itself* was *part* of the dangerous condition. His testimony constitutes substantial evidence of a dangerous condition. (Cf. *Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707, 719 [159 Cal.Rptr. 835, 602 P.2d 755]; *Curtis* v. *State of California* (1982) 128 Cal.App.3d 668, 692-693 [180 Cal.Rptr. 843].)

## PROXIMATE CAUSE

■ The state argues that the condition of the highway could not be considered a proximate cause of the accident because (1) plaintiff failed to exercise due care in continuing to drive while completely sunblinded and (2) plaintiff could not see anything anyway, therefore the deficient channelization could not have been a cause of the accident.

To the extent the argument is based on plaintiff's lack of due care, it is devoid of merit. ■ It is fundamental that there may be more than one legal cause of an accident. (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr.

---

[4]Government Code section 835 provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Government Code section 830, subdivision (a) defines *dangerous condition as follows:* " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

623, 486 P.2d 151]; *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 636-637 [128 Cal.Rptr. 807, 91 A.L.R.3d 1].) █ The fact the jury found plaintiff contributorily negligent in no way establishes that her negligence was the sole cause of the accident.

As to the state's claim that plaintiff could not have seen anything anyway, the fact is that her own testimony revealed that upon being blinded by the sun she looked down and did not see any striping. The presence, absence or relative visibility of the striping was thus a possible factor in her failure to avoid the abutment. Moreover, the presence of some kind of "sound factor" such as might have resulted from "bot dots" or "rumble stripes" or even a different surface material on that part of the roadway not intended for vehicular traffic might well have prevented the accident regardless of plaintiff's inability to see. █ Proximate cause is a question of fact. (*Osborn* v. *City of Whittier* (1951) 103 Cal.App.2d 609, 616 [230 P.2d 132].) █ There was ample evidence from which the jury could find the dangerous condition was a proximate cause of the accident.

The state relies on *Callahan* v. *City and County of San Francisco* (1971) 15 Cal.App.3d 374 [93 Cal.Rptr. 122], which it asserts is "analogous" to the case at bar. In *Callahan,* the plaintiff contended that a "T" intersection was in a dangerous condition because it was probable that a driver in foggy conditions might continue driving beyond the intersection over a cliff and plunge into a lake and that the city failed to provide adequate warning signs or devices protecting against the hazard. However, in *Callahan,* the driver was guilty of an excessive and hazardous speed, described by one witness as "maniacal." No such "mania" is present in the facts of this case.[5]

### NOTICE

█ The state contends that the plaintiff failed to prove notice to the state of the alleged dangerous condition, as required under Government Code section 835.

While the particular dangerous condition in this case existed only 20 some days of the year, it had been in existence for over 10 years, since the construction of the highway in 1966. Under such circumstances the jury could reasonably find constructive notice of the dangerous condition.[6] "It is well settled that

---

[5]The *Callahan* court clearly based its ruling on the fact of the "maniacal speed." (See 15 Cal.App.3d at p. 379.) The court said the intersection was a "safe one *except for* drivers described by the witness here, i.e., 'maniacal.'" (*Id.,* italics added.)

[6]Government Code section 835.2 subdivision (b) provides for constructive notice. The relevant part reads: "A public entity had constructive notice of a dangerous condition within the meaning of subdivision (b) of Section 835 only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character."

constructive notice can be shown by the long continued existence of the dangerous or defective condition, and it is a question of fact for the jury to determine whether the condition complained of has existed for a sufficient time to give the public agency constructive notice. [Citations.]" (*Lorraine* v. *City of Los Angeles* (1942) 55 Cal.App.2d 27, 30-31 [130 Cal.Rptr. 140]; accord: *Eastlick* v. *City of Los Angeles* (1947) 29 Cal.2d 661, 672 [177 P.2d 558, 170 A.L.R. 225] (whether public entity is chargeable with notice of dangerous condition is question of fact for jury).) ■ The question of whether the dangerous condition should have been discovered by reasonable inspection and whether there is adequate time for preventive measures is properly left to the jury (*Straughter* v. *State of California* (1976) 89 Cal.App.3d 102, 111 [152 Cal.Rptr. 147]), which, here, impliedly answered both questions in the affirmative.

### Weather Immunity

■ Finally, the state asserts a complete defense in the immunity granted it by Government Code section 831[7] for injuries caused by the effect of weather conditions. The state submits that the effect of glaring, bright sunlight is a weather condition, and was the immediate cause of the accident in this case.

The contention fails for three independent reasons. One, by its own terms, section 831 does not apply to the "effect[,] if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care." In the present case, there was sufficient testimony that, in essence, given the nature of the incline on which plaintiff was driving, the blinding sun could not be anticipated, nor was reasonably apparent. Plaintiff testified, for example, that she had no "indication" the sun was already above the horizon. Officer Gyll testified that a driver still in a shadow as he approached the intersection would not necessarily anticipate that the sun would present a "problem." Krueper testified that a driver on an upgrade of this kind would not have the same kind of time to anticipate the rising sun as would a driver on a level road.

Two, the state in its argument ignores the fact that the dangerous condition in this case was not merely the effect of blinding sunlight on a public highway, but

---

[7]Government Code section 831 provides in its entirety as follows: "Neither a public entity nor a public employee is liable for an injury caused by the effect on the use of streets and highways of weather conditions as such. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such effect if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care. For the purpose of this section, the effect on the use of streets and highways of weather conditions includes the effect of fog, wind, rain, flood, ice or snow but does not include physical damage to or deterioration of streets and highways resulting from weather conditions."

the effect of blinding sunlight combined with improper channelization and the lack of devices to properly guide and warn a driver around an object in the middle of a freeway. In this regard, *Callahan* v. *City and County of San Francisco* (1967) 249 Cal.App.2d 696 [57 Cal.Rptr. 639] (the first appeal in the *Callahan* case cited, *supra*) is dispositive. *Callahan* held that section 831 did not immunize a public entity where the "allegations of the complaint relat[ed] not only to a condition of fog, but also to the layout of the streets and especially to the appearance of a freeway where actually there was none, and to the lack of signs." (*Id.*, at pp. 704-705.) If the combination of fog plus a deceptive street layout was not barred by section 831 in *Callahan* then, a fortiori, the combinations of sunlight plus a pillar in the middle of a freeway and improper channelization should not also be barred here.

Three, even if *Callahan* were not dispositive, we still could not agree with the state's contention that section 831 applies to these facts. The state itself acknowledges that the "legislative purpose [of section 831] was to immunize against the effect of weather conditions, known or unknown, predictable or unpredictable, *which no amount of human care or foresight can fully protect against.*" (Italics added.) Considered in this light, the rising of the sun resembles more a fixed aspect of nature than it does fog, wind, rain, flood, ice or snow, none of which are absolutely certain to be present in a certain place or time. From the standpoint of "human care or foresight" the rising of the sun is like the contours of a shoreline, the nature of the soil on which a road is built or even the nightfall itself. Every day, at any given time, *regardless of the weather,* the sun occupies a predictable point in the sky relative to any given location.[8] While the weather may block the sun, the sun is nevertheless there. The same cannot be said for the weather conditions mentioned in the statute.

### DISPOSITION

The judgment is affirmed.

Morris, P. J., and McDaniel, J., concurred.

---

[8] But see Joshua 10:12-13.