Filed 11/21/14  Wilson v. Cal. Hwy. Patrol CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| STEPHEN WILSON et al., | |
| Plaintiffs and Appellants, | E056698 |
| v. | (Super.Ct.No. CIVBS1000511) |
| CALIFORNIA HIGHWAY PATROL, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  John. B. Gibson, Judge.  Affirmed.

Verlato and Roberts, and April A. Verlato for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Kristin G. Hogue, Assistant Attorney General, and Joel A. Davis, Deputy Attorney General, for Defendant and Respondent.

On November 9, 2008, Stephen Wilson was injured and Faith Wilson was killed on Interstate 40 (I-40) as a result of multiple traffic collisions due to obscured visibility caused by a sandstorm.  In an action seeking damages for personal injuries and wrongful

1

death against defendant and respondent California Highway Patrol (CHP) and others[1] alleging a dangerous condition of public property, plaintiffs and appellants Stephen Wilson, Alex Wilson, Hope Elizabeth Cronkite and Randall Wilson appeal from a summary judgment entered against them.  We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

At approximately 1:27 a.m. on November 9, 2008, the National Weather Service (NWS) issued a wind advisory to public agencies for the desert area east of Barstow: "WEST WINDS WILL INCREASE THROUGH THE REMAINDER OF TONIGHT WITH SUSTAINED WINDS BETWEEN 25 AND 35 MPH AND GUSTS AROUND 45 MPH EXPECTED BY EARLY MORNING. . . .  THE STRONG WIND GUSTS WILL CAUSE AREAS OF BLOWING DUST WITH REDUCED VISIBILITY AT TIMES. . . WINDS THIS STRONG CAN MAKE DRIVING DIFFICULT . . . ESPECIALLY FOR HIGH PROFILE VEHICLES.  USE EXTRA CAUTION."

According to plaintiffs' expert, this advisory was transmitted to all CHP stations in the affected areas.  In the three years prior to November 9, 2008, traffic collisions had occurred along I-40, between mile markers 19 and 29, due to sand obstructing visibility on August 12, 2005, November 14, 2006, December 8, 2006, and April 12, 2007.  The sandstorm on April 12, 2007, resulted in six separate traffic collisions and two fatalities.

At approximately 5:00 a.m. on November 9, 2008, Stephen and Faith Wilson woke up and prepared to start their road trip to Santa Fe, New Mexico.  At approximately

---

[1]  Because CHP is the only defendant who is a party in this appeal, other defendants and claims against them will be referred to as needed.

2

6:00 a.m., CHP Officer Ronald Fredricks began his shift in Barstow. He was assigned to I-40 between Interstate 15 (I-15) and mile marker 50. At approximately 7:30 a.m. the officer noticed a "slight wind" when issuing a traffic citation on southbound I-15. He did not head to his "assigned beat" until he received a call about the collision that occurred at approximately 8:30 a.m. Two vehicles had collided due to obscured visibility caused by a sandstorm on I-40 between mile markers 19 and 29 approximately 25 miles east of Barstow. Subsequent collisions occurred between 8:30 a.m. and 8:44 a.m., which involved many vehicles and resulted in the death of Faith Wilson, who was a passenger in the vehicle driven by Stephen Wilson (Wilson accident).

Motorists found that visibility was reduced due to sand picked up by strong winds. Eddie Elmore, a truck driver who rear-ended Stephen Wilson's Porsche sports utility vehicle, testified that when he entered the sandstorm on I-40, it was as if the desert "flipped on top of [him] and fell from the sky." Other motorists described the visibility as unpredictable and varying in intensity, where in one second you could see and the next you could not see at all. According to the declaration of expert witness Elizabeth Austin, winds had reached up to 41 miles per hour, picking up sand into the air, making even walking difficult in the wind, by 7:51 a.m. on November 9, 2008, along I-40.

Witness Salvador Heredia observed dust visible ahead at least three to four miles back from the scene of the accidents. In the last two miles approaching the accident, visibility would decrease from blowing dust, and then clear. Closer to the accident scene, visibility decreased, and Heredia could only see the back of another vehicle a few car lengths ahead. Heredia slowed to two to five miles per hour and eventually came to a

3

stop behind a vehicle ahead of him that had also stopped. Suddenly, a Porsche came from behind at a higher speed, hit the right rear corner of Heredia's trailer, and veered off the highway.

Eddie Elmore, a driver for John Christner Trucking, began encountering blowing dust and sand for many miles prior to the accident. Nonetheless, he admittedly was driving 45 to 48 miles per hour at impact despite the severe weather conditions.

The first indication to CHP of any problem near the accident site occurred at approximately 8:30 a.m. when CHP was notified of a "property damage collision" east of the scene. Officer Fredricks responded; however, by the time he arrived, the Wilson accident had occurred.

Stephen Wilson and his children initiated this action against CHP on September 25, 2009, seeking damages for the wrongful death of Faith Wilson. In the same action, Stephen Wilson sought damages for his own personal injuries. The primary theory of liability asserted against CHP is that it had maintained public property, i.e., I-40, in a dangerous condition. (Gov. Code, § 835.) Plaintiffs claimed that CHP failed to divert traffic from the known problem area and/or advise CalTrans to activate the changeable message sign on I-40 to warn motorists of the dangerous condition after receiving notice of the condition via the NWS advisory. During discovery, CHP served special interrogatories seeking the factual basis for plaintiffs' claims, including what evidence existed that CHP had actual or constructive notice of the brownout conditions a sufficient time prior to the accidents to take protective measures.

4

CHP moved for summary judgment on February 10, 2012. The motion was supported by a separate statement of material facts and an index of exhibits. The motion relied upon plaintiffs' responses to special interrogatories, arguing that plaintiffs lacked evidence to establish CHP knew or should have known of the brownout condition in time to take preventative measures. Alternatively, CHP maintained that it was immune from liability because the accident was caused by the effect of the weather on the use of the highway, which was readily apparent to any motorist using reasonable care. (Gov. Code, § 831.)

Plaintiffs filed their opposition to motion for summary judgment on April 16, 2012. They also filed a separate statement of material facts, an index of exhibits, and a request for judicial notice of records of the National Climatic Data Center. Plaintiffs admitted they had no evidence of actual notice; however, they argued that CHP had constructive notice of the situation because of the "prior instances of sand blowing in the air, onto and over the I-40 in the area of mile marker 25"; the fact that Officer Fredricks was aware of the wind, and if he had patrolled I-40 at the beginning of his shift he would have become aware of the dangerous condition; and NWS's advisory at 1:27 a.m. on November 9, 2008, regarding the dangerous condition. Plaintiffs offered reports of prior dust-related accidents occurring between 2005 and 2007 within five miles of the Wilson accident. They also offered the expert declarations of Jay Rosenthal, a meteorologist, and Thomas Ganz, a former CHP officer. CHP objected to most of these declarations as irrelevant, speculative, and beyond the expertise of either witness.

5

The trial court sustained most of CHP's objections to the expert witness declarations and granted the motion for summary judgment on May 3, 2012. The court found that CHP did not have "actual or constructive notice of the dangerous condition within the meaning of Government Code section 835." The court also found that CHP was immune from liability under Government Code section 831 on the ground that the accident was caused by the effect of weather on the use of a highway. CHP moved for and was awarded costs in the amount of $13,902.75. Judgment was entered on August 29, 2012.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when all of the papers submitted show there are no triable issues of any material fact and the moving party is entitled to a judgment as a matter of law. [Citations.] '"The purpose of a summary judgment proceeding is to permit a party to show that *material* factual claims arising from the pleadings need not be tried because they are not in dispute." [Citations.]' [Citations.]

"A defendant moving for summary judgment has the burden of showing the plaintiff's causes of action have no merit. [Citation.] A defendant meets this burden if it makes a prima facie showing that one or more elements of each cause of action cannot be established or is subject to a complete defense. [Citation.] If the defendant makes this showing, the burden shifts to the plaintiff to produce evidence demonstrating the existence of a triable issue of material fact. [Citations.]

"We review the entire record de novo, considering '"all the evidence set forth in the moving and opposition papers . . . ."' [Citation.] We disregard evidence to which a

6

sound objection was made but consider any evidence to which no objection or an unsound objection was made. [Citations.]

"'"[W]e strictly construe the moving party's evidence and liberally construe the opposing party's and accept as undisputed only those portions of the moving party's evidence that are uncontradicted." [Citation.] '. . . 'Any doubts about the propriety of summary judgment . . . are generally resolved *against* granting the motion, because that allows the future development of the case and avoids errors.'" [Citation.]' [Citation.]" (*Ahn v. Kumho Tire U.S.A., Inc.* (2014) 223 Cal.App.4th 133, 136-137 [Fourth Dist., Div. Two].)

## III. ANALYSIS

### A. Dangerous Condition of Public Property

Under the Government Claims Act, "there is no common law tort liability for public entities in California; such liability is wholly statutory. [Citations.]" (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 688.) Plaintiffs' complaint relied on Government Code section 835, which makes a public entity liable for a dangerous condition of public property.

Specifically, "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the

7

dangerous condition; or [¶] (b) The public entity had *actual or constructive notice* of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835, italics added.)

"'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a); see also Gov. Code, § 830.2.) "The existence of a dangerous condition is ordinarily a question of fact . . . but it can be decided as a matter of law if reasonable minds can come to only one conclusion. [Citation.]" (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148; see also *City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 28.)

With respect to public streets, courts have observed that "any property can be dangerous if used in a sufficiently improper manner. For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use. [Citation.] 'If [] it can be shown that the property is safe when used with due care and that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not "dangerous" within the meaning of [Government Code] section 830, subdivision (a).' [Citation.]" (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196.)

**B. Notice**

A public entity had actual notice of a dangerous condition "if it had actual knowledge of the existence of the condition and knew or should have known of its

8

dangerous character." (Gov. Code, § 835.2, subd. (a).) A public entity had constructive notice of a dangerous condition "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character. . . ." (Gov. Code, § 835.2, subd. (b).)

In granting CHP's motion for summary judgment, the trial court found that CHP did not have "actual or constructive notice of the dangerous condition within the meaning of Government Code section 835." CHP primarily relied upon plaintiffs' answers to special interrogatories seeking all facts which support the claim that CHP had notice of the dangerous condition on I-40. According to plaintiffs' responses, they could not establish that CHP had actual notice of hazardous visibility conditions at the accident scene prior to the chain of collisions. However, they claimed CHP had constructive notice based on the NWS's advisory issued at 1:27 a.m., traffic collisions that occurred around the same area in previous years as a result of dust storms, and Officer Fredricks's failure to arrive at the area, his assigned beat, prior to the first reported collision. We consider each fact relied upon by plaintiffs.

Plaintiffs argued that "CHP should be monitoring the [NWS] advisories for high winds in the Dagget-Barstow area." According to their expert, Jay Rosenthal, this information would be "immediately disseminated to the public through various means, including . . . phone dissemination to . . . state agencies including . . . the CHP. Furthermore, Mr. Rosenthal declared this data is "accessible by public agencies" and "it must be concluded that . . . CHP had direct access to information that would have warned

9

of a potentially hazardous wind and visibility condition on I-40." He added that if CHP fails to use the NWS advisories of hazardous weather, "then the logical conclusion is that there will unfortunately likely be more needless accidents and loss of life in areas where state agencies know brownouts are likely to occur during certain weather events."

Regarding NWS's 1:27 a.m. advisory, we note that it warned of strong winds "FOR PORTIONS OF SOUTHEAST CALIFORNIA AND PORTIONS OF SOUTHERN NEVADA," "INCLUDING THE CITIES OF . . . BISHOP . . . INDEPENDENCE . . . LONE PINE . . . BARSTOW . . . DAGGETT . . . FORT IRWIN." More specifically, the advisory noted that winds would be "BETWEEN 25 AND 35 MPH AND GUSTS AROUND 45 MPH . . . ." By 3:46 a.m., NWS updated its warning of "GUSTY WINDS" for "THE SOUTHERN PART OF THE OWENS VALLEY AND INTO NORTHWEST SAN BERNARDINO COUNTY."

In response to plaintiffs' claim that the advisory provided CHP with notice, CHP pointed out at the trial level and on appeal that these advisories failed to identify any current condition, specific time, or even a specific location (such as I-40) of this potentially hazardous condition. The area encompassing southeast California, northwest San Bernardino County, and the cities of Bishop, Independence, Lone Pine, Barstow, Daggett, and Fort Irwin is very large and there are a limited number of CHP officers on patrol in that area. While there is no evidence that CHP actually received the NWS advisories, even if it did, these warnings did not constitute actual notice to CHP of a dangerous condition of public property at the exact location of the Wilson accident.

10

Regardless of actual notice, plaintiffs asserted that CHP had constructive notice of the dangerous condition because of the history of sandstorms on I-40, along with the traffic collisions that occurred in the last few years within a few miles of the Wilson accident due to sandstorms. We disagree. There is no legal support for plaintiffs' view that constructive notice requires only that a public entity must have had prior knowledge of the *type* of hazard, as opposed to the specific hazard, that caused the plaintiffs' injury. In *State of California v. Superior Court (Rodenhuis)* (1968) 263 Cal.App.2d 396, the plaintiff was injured when he stepped on hot coals (the remains of a fire pit) covered by sand at a state beach. (*Id.* at p. 398.) The state moved for summary judgment on the ground it had been unaware of the coals. (*Ibid.*) The trial court denied the motion, but the appellate court issued a writ prohibiting the lower court from proceeding with the trial. (*Id.* at pp. 397, 401.) Although the state knew that other people had been burned under similar circumstances in the past, the court held as a matter of law this was not enough to show the state had constructive notice of the particular hazard that had injured the plaintiff. (*Id.* at p. 400.) The same is true here. There is no evidence that, on a specific day or days each year, at a specific time, and in a specific area, dangerous conditions exist on I-40. None of the prior accidents referenced by plaintiffs occurred on the same calendar date, time and exact location as the Wilson accident. The fact that sandstorms have caused accidents on I-40 in the past is not enough to show that CHP had constructive notice of the particular hazard that injured Stephen Wilson and claimed the life of Faith Wilson.

11

Nonetheless, plaintiffs cite the case of *Erfurt v. State of California* (1983) 141 Cal.App.3d 837 [Fourth Dist., Div. Two] (*Erfurt*) and contend that "[h]ere, as in *Erfurt* . . . the court must find that '[u]nder such circumstances the jury could reasonably find constructive notice of the dangerous condition.'" In *Erfurt*, the plaintiff was driving on a freeway when she reached the crest of an uphill climb and was suddenly looking directly into the sun. (*Id*. at p. 840.) Ahead, (1) the three-lane freeway split into a "Y," (2) a concrete pillar that supported an overpass was in the center of the "Y," and (3) a "V" shaped guardrail surrounded that pillar. (*Id.* at p. 841.) As a result of her difficulty in seeing, the plaintiff was unable to stay in her lane and struck the guardrail in front of the pillar. An officer investigating two related accidents concluded they had been caused by the glare of the sun. (*Ibid*.) The plaintiff sued the state, and a jury determined the state was 60 percent responsible for the accident and the plaintiff was 40 percent responsible. (*Id*. at p. 840.)

On appeal, we identified the dangerous condition as "the effect of blinding sunlight combined with improper channelization and the lack of devices to properly guide and warn a driver around an object in the middle of a freeway." (*Erfurt*, *supra*, 141 Cal.App.3d at p. 846.) As a result of the hill just before the "Y," a driver could be in the shade one moment and looking up the incline directly into the sun the next. For about 20 days a year and about 15 to 25 minutes during those days, the sun was in a position to affect driver vision. (*Id*. at p. 842.) With respect to the issue of constructive notice of the dangerous condition, we stated: "While the particular dangerous condition in this case existed only 20 some days of the year, it had been in existence for over 10 years, since

12

the construction of the highway in 1966. Under such circumstances the jury could reasonably find constructive notice of the dangerous condition. 'It is well settled that constructive notice can be shown by the long continued existence of the dangerous or defective condition, and it is a question of fact for the jury to determine whether the condition complained of has existed for a sufficient time to give the public agency constructive notice. [Citations.]' [Citations.]" (*Id*. at pp. 844-845, fn. omitted.) In contrast to the facts in *Erfurt*, here there is no permanent defect in the design of the highway. The only dangerous condition of I-40, the wind blowing dust over the highway, is transitory and has nothing to do with the design of the highway itself.

Likewise, we find plaintiffs' reliance on *Straughter v. State of California* (1976) 89 Cal.App.3d 102, 109-111 (*Straughter*) misplaced. In *Straughter*, the evidence showed constructive notice of ice on roadway where the state policy required continuous patrolling during freezing temperatures. Like *Erfurt*, *Straughter* involved a specific location on a road where ice was known to form under certain conditions, creating a hazard not readily visible to drivers approaching the summit. The *Straughter* court found that highway maintenance personnel had failed to follow normal procedures to spread urea on the pavement in that area before dawn in anticipation of freezing temperatures. (*Straughter*, *supra*, at p. 110.) Witnesses testified there were patches of ice in the area at least 30 minutes before the accident, the maintenance supervisor admittedly drove through the area an hour earlier and did not check the eastbound lanes for ice (*id*. at p. 110), and it was undisputed that 45 minutes before the accident the supervisor and "the sanding crew were less than a mile from the scene of the accident but had ceased the

13

continuous inspection, temperature monitoring, patrolling and application of abrasives to the shaded eastbound lanes, as required by the manual." (*Id*. at p. 111.) Here, there was no known hazard at a specific location, nor was CHP tasked with patrolling the I-40 for such hazard.

Finally, plaintiffs' claim that, had Officer Fredricks been diligent in arriving at his assigned beat he would have timely discovered the dangerous condition of I-40, is speculative at best. Plaintiffs assume that dust storms were occurring at the specific location of the Wilson accident prior to the Wilson accident. However, there is no evidence in the record to that effect. There is simply no evidence that if Officer Fredricks had been driving on I-40 in the specific area of the Wilson accident prior to its occurrence, he would have seen the dust storms. Plaintiffs' claim to the contrary is based on mere speculation. The sand storms were transient in nature.

Given the lack of any evidence (direct or circumstantial) that the specific danger was obvious, or that the situation had existed for any particular length of time, precisely at the location of the Wilson accident prior to its occurrence, there is no basis to conclude that the timing of Officer Fredricks's arrival could have altered the tragic course of events. We hold, as a matter of law, that the requirements of constructive notice, as defined in Government Code section 835.2, subdivision (b), were not met.

## C. Immunity

Government Code section 831 provides: "Neither a public entity nor a public employee is liable for an injury caused by the effect on the use of streets and highways of weather conditions as such. Nothing in this section exonerates a public entity or public

14

employee from liability for injury proximately caused by such effect *if it would not be reasonably apparent to, and would not be anticipated by, a person exercising due care*. For the purpose of this section, *the effect on the use of streets and highways of weather conditions includes* the effect of fog, *wind*, rain, flood, ice or snow but does not include physical damage to or deterioration of streets and highways resulting from weather conditions." (Italics added.)

Here, the trial court found that CHP was immune from liability under Government Code section 831 on the ground that the accident was caused by the effect of weather on the use of a highway. On appeal, plaintiffs contend the trial court "improperly concluded that [they] could not prove that the weather condition would not be reasonably apparent to, and would not be anticipated by, a person exercising due care." They argue, "[i]t is not the weather that caused [their] harm. It was sand found in the desert, picked up by the winds, causing zero visibility on the road that made I-40 dangerous on November 9, 2008." The dispositive issue of plaintiffs' contention is whether the circumstances surrounding the reduced visibility caused by the blowing sand (dangerous) condition of I-40 at the point in question failed to fulfill the mandate recited in the statute such as is necessary to prevent the weather immunity from attaching.

Turning to the record, plaintiffs offered the deposition testimonies of various drivers involved in the collisions. They agreed that visibility on I-40 was intermittent due to the sandstorm. One witness stated that "when the dust is blowing, it will clear from five seconds to the next five seconds. In other words, a gust will blow in, and the dust will come, and you won't— you won't be able to see beyond the front end of your car,

15

your vehicle. And that's how thick it was intermittently. And then that would diminish, and then you could see ahead of you. That's why it makes it kind of difficult to describe." It is uncontested there were strong winds throughout the I-40 corridor and that drivers encountered blowing dust and reduced visibility prior to the Wilson accident scene. In fact, some of the drivers anticipated the danger of blowing dust and reduced their speeds appropriately. In a nutshell, the situation involved strong winds causing a sand storm, the sand storm reducing visibility, some drivers reducing their speed in response, and the failure of some drivers to do the same resulting in collisions and individuals getting injured.

Contrary to the cases cited by plaintiffs, the facts in this case do not present a "concealed trap" situation where the danger would not be reasonably apparent to a person exercising due care. (*Allyson v. Department of Transportation* (1997) 53 Cal.App.4th 1304, 1318 [Fourth Dist., Div. Two] (*Allyson*); *Flournoy v. State of California* (1969) 275 Cal.App.2d 806, 809-810, 811 (*Flournoy*).) While the immunity defense applied in *Allyson*, it did not apply in *Flournoy*.

In *Allyson*, we applied the weather immunity defense where the plaintiff was injured by a car that lost control on an icy road. (*Allyson*, *supra*, 53 Cal.App.4th at pp. 1306-1307.) We specifically found that the state had no mandatory duty to post signs that warned of transitory (icy) conditions or to perform the service of inspecting the roads that were perfectly adequate other than the influence of the weather. (*Id*. at pp. 1319-1321.) We concluded that ice on the road was subject to the weather immunity and did not constitute a concealed trap covered by the narrow exception in Government Code

16

section 831.  (*Allyson*, *supra*, at pp. 1319-1321.)  The same is true in this case.  There was no condition of I-40 other than the wind causing a sand storm which obscured visibility that made conditions hazardous.

In *Flournoy*, the state constructed a bridge over water that would cause moisture to condense on the bridge and then freeze in cold weather.  (*Flournoy*, *supra*, 275 Cal.App.2d at p. 808.)  Many accidents occurred as a result of the icy condition on the bridge, one causing the death of Flournoy, whose heirs sued, claiming the state maintained the bridge in a dangerous condition.  (*Id*. at pp. 807-808.)  The state asserted design immunity and the trial court granted summary judgment in its favor.  Plaintiffs appealed, and the state argued that design immunity prevails over any liability for a dangerous condition of public property.  (*Id.* at p. 811.)  The appellate court disagreed, concluding that design immunity is limited to a design-caused accident.  (*Ibid*.)  Where the state is actively negligent in creating the dangerous condition (the design of the bridge), and passively negligent in failing to warn of the dangerous condition, such passive negligence was independent of the negligent design.  (*Ibid*.)

"The [legislative] intent . . . 'is to impose liability only when there is a substantial danger which is not apparent to those using the property *in a reasonably foreseeable manner with due care*.  [Citations.]'  [Citation.]"  (*Biscotti v. Yuba City Unified School Dist.* (2007) 158 Cal.App.4th 554, 558.)  Thus, "premises liability may not be imposed on a public entity when the danger of its property is readily apparent."  (*Id.* at p. 560.)  As noted above, drivers on I-40 were aware that strong winds were blowing and reducing visibility.  Most slowed down or stopped their vehicles.  Unfortunately, some did not.  In

17

short, the material fact upon which the motion for summary judgment (and the appeal) can be disposed, i.e., the availability of Government Code section 831, was simple and undisputed.

## D. The Trial Court's Evidentiary Rulings

According to plaintiffs, "[t]o recite and raise objections to all of the objections raised by [CHP] to [plaintiffs'] expert witness declarations would be oppressive and an imposition on the resources of the court." Thus, plaintiffs' sole challenge to the court's evidentiary rulings centers on the recent decision in *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749 (*Cole*). Essentially, plaintiffs claim that CHP waived its objections to plaintiffs' expert witness declarations because the objections cited Evidence Code section 800 (lay opinion) and not Evidence Code section 801 (expert opinion).

In *Cole,* a park attendant who was struck by a vehicle brought an action against the town alleging a dangerous condition. (*Cole*, *supra*, 205 Cal.App.4th at p. 754.) At the time of the accident, the plaintiff had parked her vehicle along a gravel strip between the park and the edge of a road. While loading a bicycle into her trunk, a driver who had been drinking alcohol veered off the road and collided with her. (*Ibid*.) The town was granted summary judgment on the ground that the plaintiff was unable to establish any of the stated characteristics of the property was the cause of her injuries. (*Ibid*.) The appellate court reversed, holding that "the evidence before the trial court raised numerous issues of fact concerning the existence of a dangerous condition and a causal relationship between the characteristics of the property and plaintiff's injuries." (*Ibid*.)

18

In *Cole*, the defendant objected to plaintiff's expert declaration on grounds of relevance, speculation and conclusoriness. (*Cole*, *supra*, 205 Cal.App.4th at pp. 763-764.) On appeal, the appellate court observed that the latter two characterizations support exclusion "on the ground of *improper opinion*." (*Id*. at p. 764, original italics.) The admissibility of expert opinion is governed by Evidence Code section 801; however, the defendant failed to cite to that statue. The appellate court held that "[i]nsofar as [the defendant] asserted the opinion rule, its failure to make a coherent argument in support of the objection should be viewed as an abandonment of that objection." (*Cole*, *supra*, at p. 764.)

Here, unlike in *Cole*, CHP's objections to plaintiffs' expert declarations were more specific and cited relevant case law under Evidence Code section 801. For example, plaintiff's expert, Thomas Ganz, stated: "It is further my professional opinion, to a reasonable degree of certainty, that had the CHP officers timely reported to their beats on I-40 that they would have identified the dangerous conditions and been able to warn the motoring public, including the Plaintiffs about the dangerous conditions." CHP objected as follows: "Lack of foundation; Lack of personal knowledge (Evid. Code, § 702.); Misstates facts; No preliminary facts (Evid. Code, § 400-402.); Hearsay (Evid. Code, § 1200.); Assumes facts not in evidence; Inadmissible opinion (Evid. Code, § 800(a).); Speculation. [¶] An expert declaration may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. (*Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 743, citations omitted.) [¶] Self-Serving, Lacking

19

Explanation.  Plaintiff may not 'manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions, devoid of any bias, explanation or reasoning.'  (*McGonnell v. Kaiser Gypsum Company, Inc., et al.* (2002) 98 Cal.App.4th 1098, 1106.)  An expert witness 'may not himself create the facts upon which the conclusion is based.'  (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487, citations omitted.)  [¶]  Improper legal conclusion.  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1120.)  [affidavits and declarations must cite evidentiary facts, not legal conclusions or 'ultimate' facts]."  This objection was repeated in numerous objections to plaintiffs' experts' declarations.

Focusing on the level of detail provided in the objections to expert declarations, the contrast between what CHP provided versus what was provided in the *Cole* case leads us to only one conclusion; plaintiffs' reliance on *Cole* is misplaced.  Despite CHP's reference to Evidence Code section 800 and not Evidence Code section 801, the detail of reasoning offered by CHP was sufficient "to make a coherent argument in support of the objection."  (*Cole*, *supra*, 205 Cal.App.4th at p. 764.)[2]

**E.  Costs**

On May 24, 2012, CHP filed its Memorandum of Costs in the amount of $15,823.75.  Plaintiffs moved to tax/strike costs.  CHP stipulated to reduce its costs by $1,921.00, representing $150 for jury fees and $1,771 for the deposition of expert

_____

[2] To the extent plaintiffs' reply brief raises any new arguments challenging the trial court's evidentiary rulings on CHP's objections of plaintiffs' experts' declarations, they are forfeited.  (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106, fn. 6, ["we do not consider arguments raised for the first time in a reply brief"].)

Timothy Cheek. Following the hearing on plaintiffs' motion, the trial court awarded CHP costs in the amount of $13,902.75.

On appeal, plaintiffs contend the trial court abused its discretion in failing to consider reducing CHP's costs. Additionally, plaintiffs claim they met their burden of proving that the deposition costs attributed to coroner, Teri Lay ($351), and traffic engineer, Weston Pringle ($1,008), along with the cost of CHP's answer to a cross-complaint ($395) were not related or necessary to the defense of plaintiffs' action.

Code of Civil Procedure section 1032, subdivision (b) provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (See also *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1198.) A "prevailing party" includes "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. . . ." (§ 1032, subd. (a)(4).)

According to plaintiffs, CHP did not need to depose Teri Lay, the coroner who examined the decedents of the Ramirez family, because Lay did not examine Faith Wilson. CHP replies that (1) the "co-plaintiffs dismissed their claims in exchange for a waiver of costs before the Court ruled on the motion for summary judgment on May 3," and (2) plaintiffs noticed Lay's deposition. We agree with CHP and conclude that the award of this cost is appropriate. Regarding the deposition of Weston Pringle, a traffic engineer retained by defendant Midway Transportation, Inc. (Midway) for claims it brought against CHP, plaintiffs contend "[t]he deposition did not include any of the

21

issues raised by [them] as [they] had a retained traffic engineer expert witness of their own." While CHP agrees that Pringle was retained by defendant Midway, it asserts that "the plaintiffs and Midway largely relied on the same evidence in opposing the motions for summary judgment by CHP and CalTrans." Again, we agree with CHP and do not disturb the award of this cost.

Finally, plaintiffs claim the cost of CHP's answer to Midway's cross-complaint was not reasonably necessary to the defense of plaintiffs' claims. In response, CHP cites *Nelson v. Anderson* (1999) 72 Cal.App.4th 111 (*Nelson*) and argues that "the trial court did not have authority to disallow or reduce costs that defendant CHP is entitled to recover as a matter of right."

In *Nelson*, plaintiff Nelson and two other plaintiffs sued actress Loni Anderson and her attorneys, Musick, Peeler & Garrett (MPG), for interference with contract and legal malpractice, among other claims. (*Nelson*, *supra*, 72 Cal.App.4th at p. 117.) MPG settled with the two other plaintiffs, but not Nelson, who ultimately prevailed against Anderson but not against MPG. (*Id*. at pp. 117, 122.) MPG sought costs against Nelson, and Nelson filed a motion to strike the costs. (*Id*. at p. 122.) The trial court granted costs in favor of MPG but reduced the amount awarded by two-thirds: "As the court explained in its minute order granting the motion [to strike costs], it reduced MPG's pretrial costs 'because . . . [MPG] settled with the other two Plaintiffs, and . . . one of the terms of those settlements was that MPG would waive its right to collect costs; it would be unfair to Plaintiff Nelson, and would constitute an inappropriate windfall to MPG to allow it to

22

collect all of its pre-trial costs from Nelson.'" (*Id*. at p. 128.) MPG appealed the order reducing costs by two-thirds.

The appellate court concluded that MPG was a prevailing party: "Since MPG was a defendant against whom Nelson obtained no relief, MPG was the prevailing party. (Code Civ. Proc., § 1032, subd. (a)(4).) 'Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.' (Code Civ. Proc., § 1032, subd. (b).) This means that the prevailing party is entitled to all of his costs unless another statute provides otherwise. [Citation.] Absent such statutory authority, the court has no discretion to deny costs to the prevailing party. [Citation.] [¶] Code of Civil Procedure section 1033 enumerates allowable costs and costs which are not allowable, and restricts allowable costs to those reasonably necessary to the conduct of the litigation. We have found no statutory authority for reducing allowable costs for any of the reasons advanced by the trial court. 'A court should be cautious in engrafting exceptions onto the clear language of Code of Civil Procedure section 1032.' [Citation.]" (*Nelson*, *supra*, 72 Cal.App.4th at pp. 128-129.) Our colleagues in Division Seven of the Second District reversed the two-thirds reduction ordered by the trial court.

Here, plaintiffs agree there is "no statutory authority or case law for an across the board reduction in costs based on the number of plaintiffs involved in litigation . . . ." However, they argue the "necessity or reasonableness of costs" should govern whether certain costs are recoverable. According to plaintiffs, filing an answer to Midway's cross-complaint was not reasonably necessary to the defense of plaintiffs' claims. We

23

disagree. But for plaintiffs' complaint, there would not have been a cross-complaint by Midway against CHP. As CHP noted, "the plaintiffs and Midway largely relied on the same evidence in opposing the motions for summary judgment by CHP and CalTrans." Regardless of plaintiffs' dismissal of their action against Midway, the cross-action remained viable with claims against CHP that were identical to plaintiffs' claims against CHP. Given this similarity, the trial court acted within its discretion by allowing CHP to recover its cost of filing an answer to Midway's cross-complaint.

## IV. DISPOSITION

The judgment is affirmed. Defendant and Respondent shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

KING
J.

CODRINGTON
J.

24